EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Recurrido<br><br>v.<br><br>Leandro Ruiz Martínez<br><br>Peticionario | Certiorari<br><br>2003 TSPR 52<br><br>158 DPR \_\_\_\_ |

Número del Caso: CC-2002-35


Fecha: 8 de abril de 2003


Tribunal de Circuito de Apelaciones:
                        Circuito Regional V


Juez Ponente:
                    Hon. German J. Brau Ramírez


Oficina del Hon. Procurador General:

                    Lcda. Rose Mary Corchado Lorent
                    Procuradora General Auxiliar


Abogada de la Parte Peticionaria:

                    Lcda. Candida Valdespino Zapata

Clínica de Asistencia Legal de la Escuela de Derecho de la Universidad
de Puerto Rico:

                    Lcdo. Ricardo Ramírez Lugo

Materia: Artículo 3.2, Ley Núm. 54




Este documento constituye un documento oficial del Tribunal Supremo que
está sujeto a los cambios y correcciones del proceso de compilación y
publicación oficial de las decisiones del Tribunal. Su distribución
electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


El Pueblo de Puerto Rico

    Recurrido

       v.                      CC-2002-35        Certiorari

Leandro Ruiz Martínez

    Peticionario


PER CURIAM

San Juan, Puerto Rico a 8 de abril de 2003.

Nos corresponde resolver si las disposiciones de la *Ley para la Prevención e Intervención con la Violencia Doméstica*[1] (en adelante, "Ley Núm. 54") aplican a actos de agresión que se susciten dentro de una relación de pareja de un mismo sexo.

Por no encontrar en el historial legislativo del referido estatuto fundamento alguno que apunte a que así sea, y en atención al principio de legalidad, que nos exige interpretar restrictivamente los estatutos penales, resolvemos en contrario.

---

[1] Ley Núm. 54 de 15 de agosto de 1989, 8 L.P.R.A. § 601 *et seq.*

I

Por hechos ocurridos en la noche del 15 de abril de 2001, se presentó contra el Sr. Leandro Ruiz Martínez (en adelante, "el peticionario" o "Sr. Ruiz Martínez"), una denuncia por infracción al Art. 3.2 de la Ley Núm. 54, 8 L.P.R.A. § 632, que tipifica el delito de "maltrato agravado" (delito grave), la cual lee como sigue:

> El referido acusado Leandro Ruiz Martnez [sic], en o allá para el 15 de abril de 2001 y en Yauco, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia de Puerto Rico, Sala Superior de Ponce, legal, voluntaria, maliciosa y criminalmente, empleó violencia física contra Juan del Valle Rodríguez, con quien sostiene una relación homosexual, consistente en que le dio con los puños en los brazos y le mordió un seno, sintiendo ésta temor por su seguridad.  Todo ello en violación a una orden de protección vigente, expedida por la Honorable Juez María Soledad Gil Delgado, del 11 de abril de 2001 al 11 de octubre de 2001.[2]

Luego de su arresto, el peticionario prestó la fianza impuesta.  Celebrada la vista preliminar, se le determinó causa probable para acusar por el delito imputado.  De este modo, la acusación se presentó bajo el palio de la Ley Núm. 54 toda vez que, mediante directriz de 5 de abril de 2001, la Secretaria de Justicia, Hon. Anabelle Rodríguez, impartió instrucciones a los fiscales para que a partir de dicha orden, presentaran cargos

---

[2] *Véase* Apéndice, a la pág. 76.

contra parejas del mismo sexo por delitos tipificados bajo la referida Ley.[3]

Tras varios incidentes procesales, el 31 de mayo de 2001, el peticionario presentó una moción de desestimación al amparo de la Regla 64(p) de las de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R.64(p). Dicha moción se fundamentó en que la acusación fue contraria a derecho, ya que la Ley Núm. 54 no le es aplicable a relaciones homosexuales.[4] El Ministerio Público se opuso, sosteniendo que la referida Ley cobija a todo tipo de relación consensual, independientemente del nexo conyugal y del género de las partes involucradas.

Así las cosas, el 22 de junio de 2001, el Tribunal de Primera Instancia (en adelante, "TPI") desestimó la acusación, concluyendo que la Ley Núm. 54 no aplica a la situación de autos. En consecuencia, intimó a que se dirigiese el proceso por la vía penal ordinaria.

De este dictamen, el Procurador General apeló al Tribunal de Circuito de Apelaciones (en adelante, "TCA"),

---

[3] La directriz emitida por la Secretaria de Justicia expresó además que tampoco será impedimento para llevar un caso por violación a dicha ley el hecho que el ofensor o la víctima esté casado con una tercera persona. *Véase* Berio y Alvarado, Noticias Jurídicas, Boletín Núm. 9, Julio 2001, *Aplicación de la Ley de Violencia Doméstica a parejas del mismo sexo*, en http://noticias.juridicas.com/areas_virtual/Revistas/99-Puerto%20Rico/prico9.html (Visitada el 17 de marzo de 2003).

[4] Para sostener esta alegación, el peticionario invocó lo resuelto por el Tribunal de Circuito de Apelaciones en el caso *Pueblo v. Valentín Capó*, KLCE99-01307, resolución de 30 de abril de 1999, 99 J.T.A. 1287.

el cual revocó la decisión del TPI.[5] Dicho foro fundamentó su sentencia en que, a la luz del espíritu de la ley, el término "relación consensual" presente en el artículo 1.3 de la Ley Núm. 54, 8 L.P.R.A. § 602, no excluye las relaciones de parejas de un mismo sexo. Además, expresó que a pesar de que el Código Penal tipifica como delito esta clase de relación, ello no es óbice para que la Ley Núm. 54 se extienda a dichas parejas.

Inconforme, el peticionario acudió ante este Foro, señalando que:

> **Erró el Tribunal de Circuito de Apelaciones al revocar la decisión del Tribunal de Primera Instancia[,] el cual resolvió que la actuación imputada estaba tipificada en el delito de agresión[,] según estatuido en el Código Penal[,] y no en el Artículo 3.2 de la Ley 54 para la Prevención e Intervención contra la Violencia Doméstica, siendo del mismo sexo las dos personas envueltas en los hechos.**

Expedimos certiorari mediante Resolución de 22 de febrero de 2002. Habiendo comparecido las partes, resolvemos.

II

El Art. 3.1 de la Ley Núm. 54 de 15 de agosto de 1989, 8 L.P.R.A. § 631, tipifica el delito de "maltrato" de la siguiente manera:

> Toda persona que empleare fuerza física o violencia psicológica, intimidación o persecución en la persona de su cónyuge, ex cónyuge, o la persona

---

[5] El Juez Brau Ramírez emitió la opinión del panel, a la que se unió el Juez Ortiz Carrión. La Juez Pabón Charneco emitió una fundamentada opinión disidente.

CC-2002-35                                                                          5

> con quien cohabita o haya cohabitado, o la persona con quien sostuviere o haya sostenido una relación consensual, o la persona con quien haya procreado un hijo o hija, para causarle daño físico a su persona, a los bienes apreciados por ésta, excepto aquellos que pertenecen privativamente al ofensor, o a la persona de otro o para causarle grave daño emocional....[6]

Al aprobar la referida ley, y por ende el citado artículo, nuestra Asamblea Legislativa tuvo como norte el reconocer la violencia doméstica como un elemento dañino a nuestra sociedad, en especial a la institución de la familia.  De la Exposición de Motivos de dicha Ley, surge diáfanamente el espíritu que permeó su aprobación:

> La violencia doméstica es un comportamiento antisocial que constituye un serio problema **para la familia puertorriqueña**[...] A pesar de que tanto los hombres como las mujeres pueden ser víctimas de maltrato conyugal, ***los estudios demuestran que las mujeres son usualmente las víctimas de la conducta agresiva y violenta que denominamos maltrato*** conyugal[...] Tolerar la violencia doméstica hoy ***contribuye a la desintegración de la familia***, a fomentar la criminalidad y al debilitamiento de los valores de la convivencia humana....(énfasis suplido).

Conforme a estos motivos, el Art. 1.2 enuncia a grandes rasgos la política pública que propone establecer y adelantar dicha Ley:

> El Gobierno de Puerto Rico reconoce que la violencia doméstica es uno de los problemas más graves y complejos que confronta nuestra sociedad.  En el desarrollo de la política sobre este

---

[6] El Artículo 3.2 de la Ley Núm. 54, 8 L.P.R.A. § 632, bajo el cual se acusa al aquí peticionario, expone los agravantes a la conducta tipificada en la disposición citada, configurando pues, el "maltrato agravado."

asunto, debemos dar énfasis a atender las dificultades que las situaciones de violencia doméstica presentan, particularmente a mujeres y menores, para preservar su integridad física y emocional, procurar su seguridad y salvar sus vidas.

*La violencia doméstica es una de las manifestaciones más críticas de los efectos de la inequidad en las relaciones entre hombres y mujeres.* Las ideas, actitudes y conductas discriminatorias también permean las instituciones llamadas a resolver y a prevenir el problema de la violencia doméstica y sus consecuencias. Los esfuerzos de estas instituciones hacia la identificación, comprensión y atención del mismo han sido limitados y en ocasiones inadecuados.

El Gobierno de Puerto Rico se reafirma en su compromiso constitucional de proteger la vida, la seguridad y la dignidad de hombres y mujeres. Además, *reconoce que la violencia doméstica atenta contra la integridad misma de la familia* y de sus miembros y constituye una seria amenaza a la estabilidad y a la preservación de la convivencia civilizada de nuestro pueblo.

Como política pública, el Gobierno de Puerto Rico repudia enérgicamente la violencia doméstica *por ser contraria a los valores de paz, dignidad y respeto que este pueblo quiere mantener para los individuos, las familias y la comunidad en general*. A través de esta política pública se propicia el desarrollo, establecimiento y fortalecimiento de remedios eficaces para ofrecer protección y ayuda a víctimas, alternativas para la rehabilitación de los ofensores y estrategias para la prevención de la violencia doméstica. 8 L.P.R.A. § 601 (énfasis suplido).

De estas líneas, se puede colegir que el propósito cardinal de la política pública enunciada es el fortalecer la institución de la familia, que se visualiza

como una que surge y se ampara en la unión sentimental y legal entre un hombre y una mujer.[7]

No obstante, el TCA sostuvo que dentro de las relaciones objeto de protección bajo la Ley Núm. 54, *supra*, se encuentra aquella relación sentimental constituida por dos (o más) personas del mismo sexo. Para sostener dicha interpretación, se amparó en la definición de *relación de pareja* que provee la Ley Núm. 54, supra, específicamente el concepto de "relación consensual íntima." A estos efectos, el Art. 1.3 de la Ley define *relación de pareja* como:

> ....
>
> (i) Relación de pareja– Significa la relación entre cónyuges, ex cónyuges, las personas que cohabitan o han cohabitado, **las que sostienen o han sostenido una relación consensual íntima** y los que han procreado entre sí un hijo o una hija.
>
> ....
> 8 L.P.R.A. § 602 (i)(énfasis suplido).

---

[7] Nuestra jurisprudencia es consistente en interpretar el Derecho de modo que se adelante esta política pública. Recientemente resolvimos el caso *Pérez v. Procurador Especial de Relaciones de Familia*, res. el 27 de abril de 1999, 148 D.P.R. ___ (1999), 99 T.S.P.R. 64, 99 J.T.S.70, en el cual sostuvimos que en aras de "promover la conservación de la unidad familiar y de prevenir la desintegración de la familia...el Estado mantuvo la certeza del vínculo matrimonial, como requisito de carácter jurisdiccional para la adopción conjunta." 99 T.S.P.R. 64, a la pág. 3. De hecho, en dicha decisión, al interpretar que la Ley de Adopción de 1995 no permite la adopción por parejas que sostienen una "relación consensual", la conceptualizamos como una relación afectiva–cohabitativa–no matrimonial entre un hombre y una mujer. Es decir, en dicha ocasión una mayoría de este Tribunal equiparó la "relación consensual" con la figura del concubinato, y no con una relación de pareja entre personas del mismo sexo.

Ante la controversia en cuanto al verdadero significado del concepto *relación consensual íntima*, nos vemos precisados a indagar sobre la intención legislativa respecto al alcance a dársele a esta definición. Para ello, es menester referirnos al historial legislativo de la Ley Núm. 54, *supra*.[8]

## A. Intención Legislativa de la Ley Núm. 54

La Ley Núm. 54 se aprobó luego de un complejo trámite legislativo,[9] y tras un intenso cabildeo de

---

[8] *Véase Sucn. Álvarez Crespo v. Secretario de Justicia*, res. el 11 de febrero de 2000, 150 D.P.R. ___, 2000 T.S.P.R. 21, 2000 J.T.S. 40; *Caballero v. Sistemas de Retiro*, 129 D.P.R. 146 (1991)

[9] El 2 de febrero de 1989, la Senadora Velda González de Modesti presentó el P. del S. 90, el cual proponía añadir el Art. 122-A al Código Penal de Puerto Rico, con el fin de tipificar como delito el Maltrato Conyugal, y establecer las penalidades correspondientes. Luego de celebrarse vistas públicas sobre ese proyecto de ley, el 28 de abril de 1989 el entonces gobernador Rafael Hernández Colón envió a la Legislatura el Proyecto de Administración F121, el cual al ser recibido por Cámara y Senado se convirtió en el P. de la C. 615 y P. del S. 470, respectivamente. Dicho Proyecto de Administración perseguía establecer un mecanismo legal amplio y comprensivo para lidiar de manera integrada con el mal de la violencia doméstica. Ante esta situación, la Senadora González de Modesti mostró interés en incorporar las propuestas del P. del S. 90 en el Proyecto de Administración.

Dada la confusión que creó la existencia simultánea de todas estas iniciativas legislativas, se acordó celebrar una vista legislativa especial, a modo de Mesa Redonda. Dicha vista fue co-presidida por la Senadora González de Modesti y por el Senador Marco A. Rigau. El
continúa...
...[9] continuación

25 de junio de 1989, y luego de varias vistas públicas, se radicaron en el Senado el Sustitutivo de P. del S. 90 y el Sustitutivo de P. del S. 470, que incorporaron los hallazgos resultantes de las vistas públicas e integraron las propuestas de las diversas iniciativas legislativas

varias agrupaciones en pro de los derechos de la mujer y de derechos humanos.  El historial legislativo de la Ley Núm. 54, *supra*, destaca que el interés del Estado en dicha legislación respondía a la realidad de que las leyes penales tradicionales no proveían un remedio adecuado para atender las características particulares del maltrato conyugal.  *Véase* Informe Conjunto de las Comisiones de lo Jurídico, de Desarrollo Cultural y de Asuntos de la Mujer, Diario de Sesiones, Asamblea Legislativa (Senado), 26 de junio de 1989, pág. 2290. *Véase además* Ponencia de la Directora Ejecutiva de la Comisión de Asuntos de la Mujer ante las Comisiones de lo Jurídico Penal, Jurídico Civil y Comisión Especial de la Mujer de la Cámara de Representante, P. de la C. 615, a la pág. 20.

Un análisis exhaustivo de las ponencias ante las comisiones legislativas disponibles en récord, demuestra claramente que el enfoque primordial de esta legislación es la protección de la mujer maltratada en una relación de pareja.  De hecho, esta conclusión está sustentada por la doctrina.  A esos efectos, *véase* Esther Vicente, *supra*, a la pág.578, quien sostiene que "[a]ct 54 is

_____

que hasta ese momento estaban pendientes ante la Asamblea Legislativa.  Estas piezas legislativas fueron aprobadas el 26 de junio de 1989 en la Cámara de Representantes, y en la madrugada del 27 de junio de 1989 en el Senado. Para una discusión detallada sobre el proceso de formulación, aprobación e implementación de la Ley Núm. 54, *véase* Esther Vicente, *Beyond Law Reform: The Puerto Rican Experience in the Construction and Implementation of the Domestic Violence Act*, 68 Rev. Jur. U.P.R. 553 (1999).

primarily intended for providing protection to women survivors of domestic abuse. It establishes, as does the Statement of Purposes of the Act, that women are the principal victims in incidents of domestic abuse." Este ejercicio legislativo enfocado en la mujer es consustancial con el propósito de liberar a ésta de las desventajas que supone su rol tradicional en el sistema social del patriarcado,[10] el cual la relega a un rol secundario y pasivo dentro de la relación de pareja. La Prof. Vicente añade, a la pág. 578, que "it is recognized that intimate violence is based on women's subordinated status, *__in the unequal power relations between men and women__* and is the result of discriminatory gender based ideas, practices and conduct"[11] (énfasis suplido).

---

[10] La visión arcaica de las relaciones de pareja llegó a considerar a la mujer como propiedad de su marido. De hecho, por siglos a los hombres se les permitió castigar a sus esposas impunemente. Se consideraba el empleo de fuerza moderada por parte del hombre como un mecanismo socialmente aceptado para ejercer su rol de jefe de familia. En Inglaterra estuvo vigente la regla conocida como "Rule of Thumb," que luego se incorporó en algunas jurisdicciones estatales de Estados Unidos, que propugnaba que "the husband has the right to inflict moderate personal chastisement on his wife, provided he use a stick no larger than his thumb." *Véase* Prosser, *Handbook on the Law of Torts* 136 (4th Ed. 1971)(citas omitidas).

[11] A igual resultado llegamos si nos referimos a los

continúa...

... 11 continuación

debates en el hemicicло al aprobarse la susodicha legislación. A esos efectos, nos parecen sumamente ilustrativas las palabras de la entonces senadora, Hon. Victoria Muñoz Mendoza, quien expresó en ese momento:

Sra. Muñoz Mendoza: El valor inestimable de este proyecto es que va a

No obstante lo anteriormente reseñado, y a pesar de ser el maltrato contra la mujer casada el problema que dominó el proceso legislativo de la Ley Núm. 54, *supra*, el proyecto terminó aprobándose con un lenguaje neutral entre el hombre y la mujer, y protegiendo una serie de relaciones que trascienden el vínculo conyugal. Ahora bien, el hecho de que se trascendiera la relación conyugal no significa que se trascendiera la relación afectiva hombre-mujer.[12]

El Art. 1.3 (k) de la Ley Núm. 54 define "violencia doméstica" como:

> [U]n patrón de conducta constante de empleo de fuerza física o violencia psicológica, intimidación o persecución contra una persona ***por parte de su cónyuge, ex cónyuge, una persona con quien cohabita o haya cohabitado, con quien sostiene o haya sostenido una relación consensual o una persona con quien se haya procreado una hija o un hijo***, para causarle daño físico a su persona, sus bienes o a la persona de otro o para causarle grave daño emocional. 8 L.P.R.A. § 602(k).

_____

> decir a esa tradición y a eso que se llama la costumbre, ¡basta ya! a la práctica bochornosa de humillar y maltratar [a] otro ser humano que es igual que tú, **simplemente por que tiene un sexo diferente al tuyo**... y ese mensaje es radical, es innovador y es valiente. Diario de Sesiones, Senado, 26 de junio de 1989 – Núm. 66, p. 2345 (énfasis suplido).

[12] La ley se ha aplicado a favor de hombres maltratados, pero dentro de relaciones heterosexuales. *Véase Pueblo v. Figueroa* Santana, res. el 23 de julio de 2001, 154 D.P.R. ___ (2001); 2001 T.S.P.R 112, 2001 J.T.S. 115.

De las disposiciones del citado artículo, se desprende que las relaciones afectivas incluidas se circunscriben a aquellas entre personas de sexo opuesto.

Primeramente, en cuanto a los cónyuges, se trata de la figura del matrimonio, relación que define el Art. 68 del Código Civil, 31 L.P.R.A. § 221, como "una institución civil que procede de un contrato civil en virtud del cual **un hombre y una mujer** se obligan mutuamente a ser esposo y esposa, y a cumplir el uno para con el otro los deberes que la ley les impone..." (énfasis suplido). En cuanto a ex cónyuges, se trata obviamente de personas que estuvieron casadas en algún momento, por lo que tuvieron que cumplir con el requisito de sexos opuestos. Por tanto, en nuestro ordenamiento no cabe hablar de cónyuges o ex cónyuges del mismo sexo.

De otra parte, el término "personas que cohabiten o haya cohabitado" se refiere también a parejas de sexo opuesto. La misma Ley Núm. 54, *supra*, define "cohabitar" como "sostener una relación consensual **similar a la de los cónyuges**." 8 L.P.R.A. § 602(b)(énfasis suplido). En consecuencia, si se trata de una relación similar a la de los cónyuges, debe cumplir con el requisito de relación hombre-mujer. De hecho, las instancias en que este Tribunal ha reconocido derechos a este tipo de relación, conocida también como concubinato, se ha tratado de casos entre parejas heterosexuales. *Véase e.g. Domínguez v. E.L.A.*, 137 D.P.R. 954 (1995); *Caraballo v. Acosta*, 104 D.P.R. 474 (1975).

En cuanto a "personas con quien se haya procreado una hija o un hijo", la conclusión no puede ser más obvia. Es un concepto científico elemental el hecho que se necesitan sexos opuestos para la procreación.

Pese a lo anterior, el TCA se adhiere a la expresión "relación consensual" para encontrar en el espíritu de la ley una supuesta intención legislativa de enmarcar bajo el palio de la Ley Núm. 54 los actos de violencia que se susciten dentro de una relación homosexual. Es decir, para el tribunal recurrido "relación consensual" significa una relación sentimental mutua y voluntaria, aún más allá del matrimonio, el concubinato o la relación íntima entre un hombre y una mujer.

Consideramos que dicha interpretación no encuentra sustento en el historial legislativo del estatuto en cuestión. La expresión "relación consensual" estuvo ausente en el Proyecto de Administración radicado en ambos cuerpos legislativos el 28 de abril de 1989.[13] Dicha expresión fue incorporada en los proyectos de ley que finalmente fueron aprobados, entiéndase el Sustitutivo al P. del S. 90 y el Sustitutivo al P. del S. 470, luego de que se atendieran las recomendaciones ofrecidas en las vistas públicas celebradas para los proyectos de ley originales. A pesar que de la Exposición de Motivos, los Informes de la Comisión y los debates del hemiciclo no surge una explicación expresa

---

[13] P. de la C. 615 y P. del S. 470. *Véase* escolio 9, *supra.*

del porqué de la inclusión de dicho lenguaje, se podría explicar la inserción de éste de una manera más fiel a la intención legislativa que la interpretación ofrecida por el TCA.

A esos efectos, y a fines ilustrativos, en la Ponencia del Departamento de Justicia en torno al P. del S. 470, del 30 de mayo de 1989, a la pág. p.9, el entonces Secretario de Justicia, Hon. Héctor Rivera Cruz, al referirse al alcance de la legislación propuesta, trae ante la consideración de la Legislatura el caso *People v. Gutierrez*, 217 Cal. Rptr. 616 (1985).[14]  Este caso, que interpretó una disposición del Código Penal de California similar al artículo que enumera las relaciones protegidas en nuestra Ley Núm. 54, estableció que "[t]he fact the Legislature made these constitutionally valid classifications does not elevate any particular aspect of either category, such as cohabitation, into a necessary element of the offense in *all* cases. Cohabitation defines one of the protected classes, that is, unmarried cohabitors; it is not a constituent part of the prohibited activity." *Gutierrez*, *supra*, a la pág. 620.

---

[14] Expresa el entonces Secretario de Justicia en su Informe, a la pág. 9, que "se ha reconocido además que, independientemente de que las parejas estén casadas o no, están en riesgo de sufrir violencia doméstica. *People v. Gutierrez*, 217 Cal.Rptr. 616 (1985)."  En nota al calce inmediatamente al finalizar esta expresión, indica el referido Secretario que "[e]ste caso...al penalizar a toda persona que intencionalmente le cause daño corporal ***a su esposa o a cualquier persona del sexo opuesto con la cual cohabite***, no viola la Decimocuarta Enmienda de la Constitución de los Estados Unidos." (énfasis suplido).

A tenor con dicha ponencia, resultaría lógico concluir que se añadió al proyecto Sustitutivo la expresión "relación consensual íntima" para incluir a aquellas parejas que aunque llevan una relación afectiva-consensual, no necesariamente cohabitan, en el sentido de vivir bajo el mismo techo. Este sería el caso de novios y prometidos que llevan una relación amorosa íntima pero que no conviven. Así pues, el término "relación consensual íntima" se deriva y modifica a "cohabitar."

Esta interpretación es consistente con la política pública a favor de la familia, ya que en estas relaciones muchas veces se tienen hijos en común, además de que en algunas ocasiones suponen un eventual matrimonio. Igualmente, es consistente con la política principal de proteger y adelantar la posición de la mujer dentro las relaciones sentimentales dominantes en nuestra sociedad patriarcal, que suponen para ésta, injustamente, una posición de sumisión ante el hombre. Asimismo, refleja la política que ha predominado en este tipo de legislación en la mayoría de los estados, donde las leyes contra la violencia doméstica se han extendido a parejas que sostienen relaciones consensuales ("dating relationships").[15]

---

[15] Más de la mitad de los estados de la Unión han incluido expresamente los "dating relationships" dentro de las categorías protegidas por sus leyes contra la violencia doméstica. Estos son: Alaska, AK Stat. § 18.66.990; California, Cal. Fam. Code § 6211(c); Colorado, C.R.S.A. § 18-6-800.3 (2); Connecticut, Ct. St. § 46b-38A; Distrito de Columbia, DC St. § 16-1001(5); Hawaii, H.R.S. §586-1(2); Idaho, I.C. § 39-6303(1);

La doctrina también se ha expresado de forma tal que hace de esta interpretación una sumamente plausible. Según un importante artículo sobre el tema, entre los objetivos de los propulsores de la Ley Núm. 54, se identificó la relación entre parejas comprometidas pero no casadas como potenciales acreedores de la protección de la referida ley. A esos efectos, la Prof. Vicente expresa que "[a]s a result of these activities, the following areas related to the justice system and legal measures were identified to be in need of reform:[...]2) the extension of protection from the law to survivors of violence involved in a diversity of intimate relationships, including ***married couples, cohabitants,***

_____

Illinois, 725 ILCS 5/112A-3 (3); Massachusetts, M.G.L.A 209A § 1(e); Michigan, M.C.L.A 400.1501(e)(iii); Minnesota, M.S.A. § 518B.01(a)(7); Mississippi, Miss. Code. Ann. § 93-21-3 (a); Montana, Mont. Code Ann. §45-5-206(2)(b); Nevada, N.R.S. § 33.018; New Hampshire, N.H. Rev. Stat. § 173-B:1 (XV); New Jersey, N.J.S.A. 2C:25-19; North Carolina, N.C. Gen. Stat. §50B-1(b)(6); North Dakota, N.D. Stat. §14-07.1-01(4); Oklahoma, 22 Okl. St. Ann. § 60.1; Oregon, O.R.S. § 135.230(4)(e); Pennsylvania, 23 Pa.C.S.A. § 6102; Rhode Island, R.I. Stat. § 8-8.1-1; Tennessee, Tenn. Stat. § 36-3-601; Vermont, 15 Vt.Stat. §1101(1)(c)(2); Washington, Wash. Stat. § 10.99.020; West Virginia, W.V. Stat. § 48-27-204(4); Wyoming, Wy. Stat § 35-21-102 (H).

Esto es significativo, ya que la legislación que sirvió de modelo a la Ley Núm. 54 fue la de los estados de Illinois, Oregon, Ohio, California, New Jersey, Connecticut, Massachussets, Minnesota y Wisconsin. *Véase* Esther Vicente, *supra*, a las págs. 558-559. De estos, solamente Ohio no dispone para los "dating relationships." ***Por tanto, al usar como guía estas leyes, nuestro legislador muy bien pudo traducir "dating relationship" como "relación consensual íntima."***

***separated or divorced couples and fiancées***...."(énfasis

suplido)[16]

Por tanto, del historial legislativo y de la doctrina citada, surge con meridiana claridad que la protección a parejas de un mismo sexo no figuró en la lista de relaciones que el legislador pretendió proteger con la aprobación de la Ley Núm. 54, *supra*. Ello no fue objeto de estudio, examen, análisis estadístico ni mención de clase alguna. Esto se acentúa por el hecho de que en relaciones entre personas de un mismo sexo no cabe hablar de disparidad entre los sexos. En todo caso, con la expresión "relación consensual íntima", el legislador quiso distinguir las relaciones consensuales entre hombre y mujer en las que se convive, de aquellas en las que no se vive bajo el mismo techo, para incluir estas últimas también dentro de dicho concepto.[17]

---

[16] Esther Vicente, *supra*, a la pág. 558. Igualmente, la violencia en relaciones de noviazgo también ha recibido atención en los últimos días de parte de las autoridades estatales. Por ejemplo, el pasado 25 de noviembre de 2002, la Comisión de Asuntos de la Mujer del Senado auspició el foro "La Violencia contra la Mujer en las Relaciones de Noviazgo". En dicho foro, la Dra. Rebecca Ward, directora del Centro de Ayuda a Víctimas de Violencia (CAVV) expresó que "se estima que una de cada tres estudiantes de escuela superior han sostenido al menos una relación de noviazgo matizada por violencia sexual, física o verbal." *Véase* Marga Parés Arroyo, *Noviazgos que no son color de rosa*, El Nuevo Día, 26 de noviembre de 2002, a la pág. 26.

[17] En armonía con la política pública enunciada en la legislación, el sub-capítulo IV de la Ley Núm. 54 provee una serie de medidas dirigidas a prevenir la violencia doméstica. Para instrumentarlas, le asigna una serie de funciones a **la Comisión de Asuntos de la Mujer.** 8 L.P.R.A. §§ 651-653. Esto refuerza la conclusión de que la intención legislativa fue proteger a la mujer dentro

**B.    Principio de Legalidad**

Es un principio elemental de hermenéutica que a toda ley se le dará la interpretación que mejor responda a los propósitos que persigue.    Los tribunales deben interpretar la ley como un ente armónico, dándole sentido lógico a sus diferentes disposiciones, supliendo las posibles deficiencias cuando esto fuere necesario.  *Véase Sucn. Álvarez v. Secretario de Justicia*, *supra*, a la pág. 8.    Sin embargo, el suplir posibles deficiencias legislativas mediante una interpretación que respete la intención última del legislador, es muy distinto a *sustituir* la intención legislativa por la del juzgador. Estas expresiones adquieren mayor relevancia cuando se trata, como en el caso de autos, de darle significado a una disposición de carácter penal.

En materia de Derecho Penal, el principio de legalidad exige que los estatutos penales se interpreten restrictivamente:    "No se instará acción penal contra persona alguna por un hecho que no esté expresamente definido como delito, ni se impondrán penas o medidas de seguridad que la ley no hubiere previamente establecido. No se podrán crear por analogía delitos, penas, ni medidas de seguridad."   Artículo 8 del Código Penal de Puerto Rico, 33 L.P.R.A. § 3031.[18]   El razonamiento que

---

del seno del hogar, adelantando por consiguiente la política pública a favor de la institución de la familia.

[18] De este mandato se derivan distintos corolarios: 1) prohibición de aplicación retroactiva de la ley penal en contra  del imputado; 2) prohibición de vaguedad en la definición de los delitos y penas; 3) prohibición  de   la

subyace este principio es el evitar que el juez supla la voluntad del legislador, cuando ella está ausente, para tipificar una conducta como delictiva, ***toda vez que si hubiese existido intención de parte del legislador, éste la hubiera expresado claramente en la ley***. *Véase* Dora Nevares-Muñiz, *Código Penal de Puerto Rico, Revisado y Comentado* 19 (7ma.Ed. 2001)(énfasis suplido).

A esos efectos, el citado precepto "impone la responsabilidad al juzgador, antes de imponer una pena, de examinar minuciosamente la ley que la provee, ***para asegurarse que ésta aplica indudablemente a la conducta imputada***...[ya que] no se satisface el fundamental principio de legalidad, si para conocer lo que está vedado es necesario un esfuerzo hermenéutico propio de juristas." *Pueblo v. Martínez Yanzanis*, 142 D.P.R. 871, 877 (1997)(énfasis suplido).

No obstante, esto no significa que las leyes penales estén exentas de interpretación. Por el contrario, todas las leyes, incluso las más claras, requieren de algún grado de interpretación.[19] *Pueblo v. Ríos Dávila*, *supra*;

---

analogía en la definición de los delitos y penas, e 4) ***interpretación restrictiva de la ley penal en cuanto a la definición de delitos y penas***. *Véase* Ernesto L. Chiesa, *Derecho Penal*, 71 Rev. Jur. U.P.R. 495, 499 (2002) (énfasis suplido).

[19] El Artículo 6 del Código Penal de Puerto Rico, 33 L.P.R.A. § 3021, señala que "las palabras y frases se interpretarán según el contexto y el significado sancionado por el uso común y corriente." Según la doctrina, esta disposición contiene dos criterios interpretativos: la interpretación gramatical y la interpretación teleológica. La gramatical se refiere a que el juez habrá de examinar el significado gramatical de las palabras y la sintaxis de las oraciones en la ley.

*Pueblo v. Sierra Rodríguez*, 137 D.P.R. 903 (1995). Sin embargo, el principio de legalidad limita el ámbito de este ejercicio, permitiendo una interpretación restrictiva en cuanto el estatuto penal desfavorezca al acusado, y una liberal en lo que le favorezca. *Pueblo v. Ríos Dávila*, 143 D.P.R. 687, 697 (1997); *Pueblo v. Rodríguez Jiménez*, 128 D.P.R. 114 (1991).

Ahora bien, en cualquier caso, **es fundamental recordar que al lenguaje de una ley debe dársele la interpretación que valide el propósito del legislador, conscientes siempre de sus consecuencias**. *Pueblo v. Ríos Dávila*, *supra*. Por tanto, es indiscutible que la hermenéutica penal no favorece interpretaciones que hagan "caso omiso a la evidente intención del legislador." *Pueblo v. Ríos Dávila*, *supra*. Como expresáramos en una ocasión anterior:

> [e]n materia de hermenéutica legal sólo hay una regla que es "absolutamente invariable", y ésta es la de que debe describirse y hacerse cumplir la

_____

Si de este análisis surge una interpretación clara y aceptable, ahí concluye la misma. Por su parte, la interpretación teleológica es la que se hace en términos del resultado. ***Ésta consiste en descubrir la verdadera voluntad de la ley considerando no sólo las palabras, sino también los elementos que contribuyen a formar la intención legislativa. Como parte de este tipo de interpretación, el juzgador utiliza diferentes tipos de consideraciones. Entre ellas, descubrir la función por la cual fue creada la ley (ratio legis), el elemento sistemático, el elemento histórico (e.g. informes de comisión, exposición de motivos y trabajos preparatorios), elemento comparativo extranjero (particularmente si la ley se deriva de otra jurisdicción) y elemento extrajurídico.*** Dora Nevares-Muñiz, *Derecho Penal Puertorriqueño, Parte General*, Instituto para el Desarrollo del Derecho, a las págs. 115-116 (2000)(énfasis suplido).

verdadera intención y deseo del poder legislativo. En otras palabras, la regla de oro en materia de interpretación de leyes es que el objeto principal de todas las reglas de hermenéutica no es conseguir un objetivo arbitrario preconcebido, sino dar efecto al propósito del legislador. *Pueblo v. Zayas Rodríguez*, 147 D.P.R. 530, 549 (1999).

De acuerdo a estos pronunciamientos, debemos en primer lugar atender la letra de la Ley Núm. 54, para ver si allí existe una disposición que provea claramente para el caso de marras. No estando la relación de parejas del mismo sexo entre aquellas que la referida ley expresamente dispone para su aplicación, y habiendo concluido en la sección anterior que no fue la intención del legislador incluirlas, el principio de legalidad nos impide que procesemos al acusado bajo el palio de la misma.

III

En suma, del historial legislativo de la Ley Núm. 54 surge claramente que la conducta que el artículo 3.2 de dicha ley tipifica como "maltrato agravado" en relaciones de pareja, se limita a relaciones entre hombre y mujer. Asimismo, que al emplear el término "relación consensual íntima" el legislador quiso proteger a aquellas parejas que, aunque sostienen una relación afectiva, no "cohabitan", en el sentido de convivir bajo el mismo techo. Finalmente, el pretender procesar criminalmente la conducta del peticionario bajo una elucidación intrépida e infundada de un estatuto penal es claramente

violatorio del principio de legalidad, que establece que las leyes penales se interpretarán restrictivamente, limitándose el juzgador a encontrar la intención del legislador al aprobar la ley bajo análisis.

En vista de lo anterior, resolvemos que la conducta punible que se le imputa al peticionario, Sr. Leandro Ruiz Martínez, no puede encausarse mediante las disposiciones de la Ley Núm. 54[20], ya que éstas son aplicables únicamente a aquellos actos de violencia doméstica en la relación entre hombre y mujer.

Se revoca la sentencia del TCA y se devuelve el caso al tribunal de instancia para que continúe los procedimientos de conformidad con lo aquí dispuesto.

Se dictará sentencia de conformidad.

---

[20] La persona agredida no queda desprovista de protección aunque no aplique la Ley Núm. 54, *supra*, no solamente por que la conducta imputada puede constituir un delito bajo el Código Penal, sino porque también podrían ser de aplicación los artículos 4 y 5 de la Ley Núm. 284 de 21 de agosto de 1999, 33 L.P.R.A. §§ 4014 y 4015, que establecen un mecanismo de órdenes protectoras contra toda persona que intencionalmente manifieste un patrón de conducta persistente de acecho dirigido a intimidar a otra persona.

CC-2002-35                                                    23

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


El Pueblo de Puerto Rico

     Recurrido

          v.                    CC-2002-35        Certiorari

Leandro Ruiz Martínez

     Peticionario



SENTENCIA


San Juan, Puerto Rico a 8 de abril de 2003.

Por los fundamentos expuestos en la Opinión Per Curiam que se hace formar parte integrante de ésta, se revoca la sentencia del Tribunal de Circuito de Apelaciones dictada el 30 de noviembre de 2001 y se devuelve el caso al tribunal de instancia para que continúen los procedimientos de conformidad con lo aquí dispuesto.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Hernández Denton disiente mediante opinión escrita a la cual se une la Juez Asociada señora Naveira de Rodón. El Juez Asociado señor Fuster Berlingeri disiente mediante opinión escrita.


                    Patricia Otón Olivieri
                    Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Recurrido

        v.                          CC-2002-35

Leandro Ruiz Martínez

    Peticionario

Opinión Disidente emitida por el Juez Asociado señor Hernández Denton a la cual se une la Juez Asociada señora Naveira de Rodón

> *"It is precisely because the issue raised by this case touches the heart of what makes individuals what they are that we should be especially sensitive to the rights of those whose choices upset the majority."*[21]

San Juan, Puerto Rico, a 8 de abril de 2003.

Una vez más este Tribunal pierde una oportunidad histórica para emitir una Opinión de vanguardia social, y hacerle justicia a un sector de la sociedad cuya orientación sexual contrasta con el patrón prevaleciente en nuestro país.[22]

---

[21] Opinión disidente del Juez Asociado señor Harry A. Blackmun en el caso <u>Bowers v. Hardwick</u>, 478 U.S. 186 (1986).

[22] *Véase*, <u>Margarita Sánchez v. Secretario de Justicia</u>, res. 30 de noviembre de 2000, 2000 T.S.P.R. 175.

En el presente recurso, una mayoría resuelve que las disposiciones de la *Ley para la Prevención e Intervención con la Violencia Doméstica*[23] (en adelante, "Ley Núm. 54"), no aplican a relaciones consensuales entre personas del mismo sexo. La decisión de este Tribunal tiene el efecto de tratar a este sector minoritario de la población como ciudadanos de segunda clase privándoles de derechos reconocidos a otras personas. Por entender que, en efecto, dicha legislación cobija a las víctimas de violencia doméstica en <u>todo tipo de relación consensual</u>, disentimos.

I

Contra el señor Leandro Ruiz Martínez (en adelante, el acusado) se presentó denuncia por infracción al artículo 3.2 de la Ley Núm. 54 (maltrato agravado).[24] En esencia, se le imputó haber empleado violencia física contra el señor Juan del Valle Rodríguez, (con quien sostenía una relación consensual íntima), en violación de una orden de protección expedida cuatro (4) días antes de la fecha en que presuntamente ocurrieron los hechos imputados.[25] Específicamente, se adujo que el acusado "le dio con los puños en los brazos [al señor del Valle Rodríguez] y le mordió un seno". Oportunamente se celebró la vista preliminar y,

---

[23] Ley Núm. 54 de 15 de agosto de 1989, 8 L.P.R.A. sec. 601 et. seq. (en adelante, Ley Núm. 54).

[24] 8 L.P.R.A. sec. 632.

[25] La referida orden de protección fue expedida el 11 de abril de 2001 y los hechos que dan base al proceso penal de autos alegadamente ocurrieron el 15 de abril de 2001. En particular, la orden dispone que el acusado y el señor del Valle Rodríguez convivían desde hace seis (6) meses y que aquél había agredido al señor del Valle Rodríguez en tres (3) ocasiones. Por ello, el tribunal dispuso, *inter alia*, que el acusado debía: (i) desalojar la residencia que compartía con el señor del Valle Rodríguez, sin poder regresar a la misma, y; (ii) abstenerse de molestar, intimidar, amenazar o intervenir con el señor del Valle Rodríguez.

tras encontrar causa probable para acusar, se presentó la acusación correspondiente.

Luego de varios incidentes procesales, el acusado presentó una moción de desestimación al amparo de la Regla 64(p) de las de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R.64(p). Argumentó que la determinación de causa probable para acusar fue contraria a derecho ya que, según estima, la Ley Núm. 54 no aplica a relaciones entre personas del mismo sexo. Por su parte, el Ministerio Público se opuso y sostuvo que la referida legislación cobija a aquellas personas que son víctimas de violencia doméstica por parte de su pareja, aunque ésta fuera de su mismo sexo.

Tras el examen de rigor, el Tribunal de Primera Instancia ordenó la desestimación de la acusación. Así, concluyó que la Ley Núm. 54 está limitada a parejas heterosexuales y que la vía adecuada para atender un incidente de violencia doméstica entre una pareja consensual del mismo sexo sería a través del sistema penal tradicional (como, por ejemplo, imputando el delito de "agresión"[26]). Inconforme, el Procurador General acudió al Tribunal de Circuito de Apelaciones, quien en una fundamentada sentencia revocó el dictamen recurrido.

De esta decisión recurre el acusado y reproduce sus argumentos en contra de la aplicación de la Ley Núm. 54 a parejas del mismo sexo. Luego de un análisis acomodaticio del historial legislativo de la ley en cuestión, la mayoría de este Tribunal resolvió, en síntesis, que las disposiciones de la Ley Núm. 54 le aplican exclusivamente a parejas heterosexuales.

---

[26] Véase, Artículos 94 y 95 del Código Penal, 33 L.P.R.A. secs. 4031-4032.

Aplicarles a parejas del mismo sexo las disposiciones de esta ley, según la mayoría de este Tribunal, no sólo iría en contra del propósito de esta legislación, sino que violaría los postulados más fundamentales del principio de legalidad. Por estimar que la mayoría de este Tribunal incidió al resolver de esta forma la controversia de autos, suscribimos este disenso.

## II

De entrada debemos precisar que el acusado no cuestiona la suficiencia de la prueba desfilada durante la vista preliminar para sostener las alegaciones en dicha etapa procesal (esto es, que existía una relación íntima entre las partes y que se empleó violencia física en violación de una orden de protección). Estamos, por el contrario, ante un planteamiento estrictamente de derecho y de interpretación estatutaria; si el delito imputado (maltrato agravado dentro de una relación de pareja) tipifica tal conducta en el contexto de una relación consensual entre personas del mismo sexo.

## A

Para poder analizar efectivamente la controversia de autos, y discernir si la Ley Núm. 54 tipifica el delito de maltrato agravado en el contexto de una relación consensual entre personas del mismo sexo, es menester examinar, con cierto detenimiento, el estatuto aludido y la situación social que dio pie a su creación. Ello, ya que un análisis objetivo de dicho estatuto revela, contrario a lo dispuesto en la Opinión mayoritaria, que el mismo fue creado con un enfoque amplio y

abarcador, cuyo propósito primordial es proteger a <u>todas las víctimas de violencia doméstica</u>. Veamos.

En 1989, tras un extenso y profundo examen social, se formuló en el país una legislación especial dirigida a atender la problemática particular que presenta la violencia en las relaciones de pareja. Las características de este tipo de violencia, que la hacen distinta de otras instancias de violencia social en la medida que la víctima se encuentra íntimamente ligada a su agresor y sujeta a episodios de violencia física, emocional y psicológica con una alta probabilidad de recurrencia,[27] llevaron a la Asamblea Legislativa a formular un régimen legal específico que atendiera tal situación. "Esta ley responde al objetivo de implantar cambios en las respuestas que provee el sistema de justicia al problema de la violencia doméstica. Durante la última década se han operado cambios en la sociedad con relación a nuestra percepción y reacción <u>ante la violencia que recibe una persona de manos de aquel o aquella con quien comparte su vida</u>.". *Véase*, Memorial Explicativo sobre P. del S. 615 y P. de la C. 470, Pág. 1.

Así, con el beneficio de múltiples estudios y las comparecencias de conocedores del tema, la Asamblea Legislativa articuló la Ley Núm. 54 como respuesta gubernamental al problema de la violencia doméstica bajo la premisa de que la violencia que ocurre en los espacios de intimidad, en las relaciones de pareja, merece un trato jurídico especial ya que presenta toda una serie de implicaciones emocionales y psicológicas

---

[27] Carla Da Luz, <u>A Legal and Social Comparison of Heterosexual and Same-Sex Domestic Violence: Similar Inadequacies in Legal Recognition and Response</u>, 4 S. Cal. Rev. L. & Women's Stud. 251, 255 (1994).

CC-2002-35                                                          6

adicionales y distintas de otras modalidades de violencia social
que no podían ser adecuadamente atendidas bajo la estructura
penal tradicional.

En efecto, del historial legislativo de la Ley Núm. 54 se
refleja la inconformidad con el sistema legal vigente para
lidiar con los problemas particulares de la violencia doméstica
y se enfatiza, continuamente, que las características
particulares que presenta la violencia en las relaciones íntimas
requieren de un nuevo enfoque y de nuevos remedios para atender
el problema. "La historia de la legislación sobre la violencia
doméstica [...] parte del supuesto de que las leyes penales
creando delitos generales por sí solos, no son un remedio
efectivo para proteger a las víctimas de violencia doméstica".
*Véase*, Informe Conjunto de las Comisiones de lo Jurídico, de
Desarrollo Cultural y de Asuntos de la Mujer, Diario de
Sesiones, Asamblea Legislativa (Senado), 26 de junio de 1989,
Pág. 2290.

Precisamente, durante la formulación de la Ley Núm. 54 se
comentó ampliamente la problemática de colocar la violencia
doméstica bajo categorías más amplias e imprecisas del derecho
penal tradicional, como sería el delito de "agresión".[28] Por ello
se enfatizó que: "[d]ebe definirse el maltrato en la relación de
pareja como delito separado de manera que se comunique la
intención específica de penalizar y castigar la violencia en el

---

[28] Ello, ya que los incidentes de violencia donde la víctima está íntima y emocionalmente ligada a su agresor no pueden considerarse análogas a "las riñas en los bares o a las peleas callejeras". Véase, Ponencia de la Comisión Para los Asuntos de la Mujer ante las Comisiones de lo Jurídico, de Desarrollo Cultural y Seguridad Social y de la Mujer, Proyecto Senado 470, 1 de junio de 1989, Pág. 20 citando a la Dra. Ruth Silva Bonilla, El Marco Social de la Violencia Contra La mujer en la Vida Conyugal, Centro de Investigaciones Sociales, U.P.R. (1986) Págs. 21-23.

hogar como lo que es[,] un serio delito que repercute sobre las generaciones futuras y sobre la comunidad en su conjunto".[29]

La participación de distintos sectores sociales y profesionales fue de vital importancia en la formulación de la Ley Núm. 54 pues permitió un entendimiento abarcador del problema de la violencia doméstica en Puerto Rico. La aportación de diversas asociaciones feministas y de derechos humanos en dicho proceso fue de particular importancia ya que múltiples grupos alzaron su voz para exigir del Estado una respuesta efectiva al problema de la violencia en los espacios de intimidad; un área que hasta época reciente había evadido el tutelaje jurídico por considerarse una "esfera privada" que no merecía protección legal. Véase, Esther Vicente, Beyond Law Reform: The Puerto Rican Experience in the Construction and Implementation of the Domestic Violence Act, 68 Rev. Jur. U.P.R. 553, 557 (1999).

La Ley Núm. 54, pues, representa una respuesta social abarcadora al grave problema de la "violencia doméstica" que aún se vive en Puerto Rico y pretende cobijar a las víctimas de dicha violencia de una manera especial por todas las particularidades que esa situación presenta. *Véase*, Artículo 1.2 de la Ley Núm. 54. De hecho, la referida ley es una de las más abarcadoras.[30]  A la luz de este marco, pasemos a examinar en detalle la Ley Núm. 54 y el Art. 3.2 aquí imputado.

---

[29] Ponencia de la Comisión Para los Asuntos de la Mujer, *supra* a la Pág. 23. Véase, además, Memorial Explicativo sobre P. del S. 615 y P. de la C. 470, Pág. 6 ("[D]ada la naturaleza de la relación de pareja y dadas las necesidades que presenta la víctima de violencia doméstica es necesario tipificar esta conducta como delito particular.").

[30] "Within the international legal community, Law 54 is recognized as one of the most advanced legal efforts, globally, and as an effort to address domestic violence in an integral and complete

C

Del historial legislativo de la Ley Núm. 54 se desprende que dicha legislación se formuló para brindarle protección a cinco (5) grupos de <u>personas</u>: (i) cónyuges; (ii) ex-cónyuges; (iii) cualquier persona que cohabite o haya cohabitado con el agresor; (iv) <u>cualquier persona</u> que sostenga o haya sostenido una <u>relación consensual</u> con el agresor y; (v) cualquier persona que haya procreado un hijo o hija con el agresor.[31]

Como puede observarse, el grupo de personas protegidas es sumamente amplio y <u>no</u> se limita a aquéllas que se encuentren en una "relación conyugal". Ciertamente, una de las situaciones que motivó el proceso de reflexión social y legislativo que culminó en la Ley Núm. 54 fue la violencia doméstica contra la mujer; especialmente por parte de su cónyuge. Esto, pues no se puede ignorar que históricamente la mujer ha sido víctima de abusos sistemáticos y opresión generalizada. Véase, por ejemplo, William L. Prosser, <u>Law of Torts</u>, pág. 136, 4ta ed. (1971) ("A husband [...], as the head of the household, was recognized by the early law as having authority to discipline the members of his family. He might administer to his wife 'moderate correction', and 'restrain' her by 'domestic chastisement'[.]".

Sin embargo, el legislador no limitó la protección de Ley Núm. 54 únicamente a dicho grupo sino que prefirió elaborar un enfoque abarcador de protección. Así lo reconocimos en <u>Pueblo v.</u>

_____

manner." Jenny Rivera, <u>Puerto Rico's Domestic Violence Prevention and Intervention Law and the United States Violence Against Women Act of 1994: The Limitations of Legislative Responses</u>, 5 Colum. J. Gender & L. 78, 83 (1995). Véase además, <u>Soto v. Flores</u>, 103 F.3d 1056 (1er Cir. 1997); donde se decretó lo siguiente: "In November 1989, the Puerto Rican legislature enacted one of the nation's most comprehensive domestic violence laws, the Domestic Abuse Prevention and Intervention Act, known popularly as 'Law 54'.".

[31] Véase, Informe Conjunto de las Comisiones de lo Jurídico, de Asuntos de la Mujer y de Hacienda, Diario de Sesiones, Asamblea Legislativa (Cámara), 28 de junio de 1989, Pág.. 108.

Figueroa Santana, res. el 23 de julio de 2001, 2001 T.S.P.R. 112, donde expresamos que: "Como regla general, las víctimas más frecuentes de la problemática son las mujeres y niños, grupos que históricamente han sufrido los efectos más desgarradores de la violencia, la pobreza y el discrimen.[...] No obstante, la Ley 54, aunque generalmente en su aplicación protege a las mujeres víctimas de maltrato, se creó también para proteger a los hombres que, en ocasiones, también son víctimas silentes de este triste drama."

Así pues, a pesar de que una de las situaciones sociales que motivó el proceso legislativo que culminó con la creación de la Ley Núm. 54 fue la violencia doméstica contra la mujer, ello no impide que la Ley Núm. 54 se utilice para proteger a los hombres víctimas de este mal social.[32]  Ello, ya que una aplicación limitada de la ley, mediante la cual sólo se le brinde protección a la mujer, no sólo obviaría el propósito cardinal de dicha legislación de proteger a **toda víctima** de violencia doméstica, sino que contravendría los postulados más fundamentales de igual protección de las leyes. Así, es evidente que aunque la Ley Núm. 54 pudo haberse creado para, entre otras cosas, proteger a la mujer víctima de maltrato doméstico, la amplitud de dicha ley no se limita meramente a ello. **Es decir, la extensión de la ley es tan amplia como la variada composición de víctimas que pueda albergar nuestra sociedad.**

---

[32] Las estadísticas de la Policía del Estado Libre Asociado de Puerto Rico reseñan que para el año 2001, específicamente del primero de enero al 31 de octubre, las mujeres ofensoras de violencia doméstica ascendían a 1768.  Para el año 2002, del primero de enero al 31 de diciembre, la cifra aumentó a 2187.

Además, interpretar la Ley Núm. 54 de modo que la misma sólo proteja a parejas heterosexuales, tiene el efecto de colocar al estatuto en cuestión al margen de la Constitución en la medida en que se le niega a la víctima de autos la igual protección de la ley por la única consideración del género de la persona que le agredió. El efecto de dicha interpretación es que se le da un trato discriminatorio a la víctima, y se deja impune a un maltratante por la única razón de su orientación sexual. Dicha conclusión no sólo es injusta para la víctima, sino que además es jurídicamente insostenible en nuestro sistema de derecho.

A tales efectos el Tribunal Supremo de los Estados Unidos ha señalado que: "[A] disqualification of a class of persons from the right to seek specific protection from the law [,] unprecedented in our jurisprudence [, offends] both… the rule of law and [the] Constitution's guarantee of equal protection". Romer v. Evans, 517 U.S. 620 (1996).[33] Como se puede observar, la interpretación que hace la mayoría de este Tribunal amenaza la validez del estatuto en cuestión toda vez que se le niega a un grupo de nuestra sociedad las garantías que dicho estatuto ofrece, contrario a los principios más básicos de igual protección de las leyes.

---

[33] Véase además, Laurence H. Tribe, Saenz Sans Prophecy: Does the Privileges or Immunities Revival Portend the Future--Or Reveal the Structure of the Present?, 113 Harv. L. Rev. 110 (1999). En efecto, como comenta el profesor Tribe, *supra* a la Pág. 173, en dicha ocasión el Tribunal Supremo federal determinó que: "a rule rendering a class of persons (there, persons characterized by 'homosexual, lesbian or bisexual orientation, conduct, practices, or relationships') ineligible for the protection of Colorado's laws from an entire category of mistreatment (there, what the rule called 'any . . . claim of discrimination') was fundamentally incompatible with the structure of a liberal legal order that undertakes to regulate in accord with the rule of law and permits lines to be drawn among persons for purposes of disparate treatment only if the objectives served by drawing those lines adequately justify the distinctions drawn."

Por otro lado, dicha conclusión contraviene lo resuelto por esta Curia en <u>Afanador Irizarry v. Roger Electric Co., Inc.</u>, res. el 26 de abril de 2002, 2002 T.S.P.R. 056. En dicho caso reconocimos que en nuestra jurisdicción procedía una causa de acción por hostigamiento sexual entre personas del <u>mismo</u> sexo, sin que el género de dichas personas fuese un obstáculo para ello.

Valga resaltar que la situación en dicho caso era muy parecida a la de autos en la medida que la víctima típica de hostigamiento sexual suele ser la mujer, aunque el problema afecta tanto a hombres como a mujeres. Así, establecimos:[34]

> Es un hecho indiscutible que, tradicionalmente, es la mujer la que suele ser la víctima de ataques discriminatorios por razón de su sexo. [...] No obstante ello, aunque la víctima típica suele ser la mujer, <u>precisa destacar que la magnitud de este problema alcanza tanto a la mujer como al hombre;</u> ambos pueden ser objeto de esta conducta, pues el hostigamiento sexual no es otra cosa que <u>una ofensa repudiable contra la dignidad de todo ser humano</u>[.] [...]

> Dada esta realidad, forzoso resulta reconocer que mediante la Ley 17, ante, no sólo se procura erradicar el problema de hostigamiento sexual en el empleo con respecto a su principal víctima, sino que, más bien, se intenta **proteger a toda la fuerza laboral** del consabido mal social indistintamente del sexo de su autor y de las formas en que pueda manifestarse. <u>Dicho de otro modo, el factor decisivo en una reclamación por conducta constitutiva de hostigamiento no es si la misma se dio dentro de un contexto heterosexual. Más bien, lo determinante es que la conducta discriminatoria se dé en función del sexo de quien la padece, por lo que, si la reclamación satisface los requerimientos establecidos, encuentra cabida dentro del ámbito de protección de la ley</u>. [...]

> En ese sentido, afirmó el [Tribunal Supremo federal en <u>Oncale</u> v. Sundowner Offshore Services, Inc., 523 U.S. 75, 79 (1998)]:

---

[34] <u>Afanador Irizarry v. Roger Electric Co., Inc.</u>, *supra*.

"As some courts have observed, male-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII. But statutory prohibitions often go beyond the principal evil to cover reasonable comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." (Subrayado en el original y negrillas suplidas).

De la misma forma que en Afanador Irizarry, *supra*, hoy sostenemos que a través de la Ley Núm. 54 el legislador reconoció que la violencia doméstica es un problema que no se limita a las relaciones conyugales o heterosexuales, sino que también alcanza a otros tipos de "relaciones de pareja", incluyendo a las relaciones íntimas afectivas fuera del matrimonio.

El propósito de la Ley Núm. 54 es proteger de manera particular a toda persona del riesgo de ser víctima de violencia doméstica en el contexto de una relación de pareja, con independencia de su género u orientación sexual. El énfasis es pues en la **víctima** por las particularidades que presenta la violencia doméstica en las relaciones de pareja y las consecuencias nocivas que esto tiene para la sociedad. Por ello, y tomando en consideración lo variado que puede ser la interacción humana, la aludida legislación está formulada en términos neutrales (siguiendo el enfoque mayoritario de las jurisdicciones estatales) y enfatiza continuamente que la protección es a la "persona". Así, define "violencia doméstica" como:

> [U]n patrón de conducta constante de empleo de fuerza física o violencia psicológica, intimidación o persecución contra una persona por parte de su cónyuge, ex cónyuge,

una <u>persona</u> con quien cohabita o haya cohabitado, con quien sostiene o haya sostenido una relación consensual o una <u>persona</u> con quien se haya procreado una hija o un hijo, para causarle daño físico a su persona, sus bienes o a la persona de otro o para causarle grave daño emocional. 8 L.P.R.A. sec. 602(k). (Énfasis suplido).

De la misma forma, en la exposición de motivos de la Ley Núm. 54, el legislador reconoce que:

La violencia doméstica es un comportamiento antisocial que constituye un serio problema para la familia puertorriqueña. Se trate del maltrato físico y emocional que sufre una <u>persona</u> a manos de su cónyuge o ex cónyuge, o a manos de una <u>persona</u> con quien sostiene o ha sostenido una relación íntima. (Énfasis suplido).

De la propia exposición de motivos se desprende que el norte de esta legislación es la protección de una <u>persona </u>que es agredida en el contexto de una <u>relación íntima</u>. La naturaleza neutral de la legislación en cuestión se reitera en el artículo 2.1, 8 L.P.R.A. sec. 621, (órdenes de protección) que dispone: "<u>Cualquier persona</u> que haya sido víctima de violencia doméstica [...] en el contexto de una relación de pareja, podrá [...] solicitar una orden de protección[.]". (Énfasis suplido).

A tenor con esta visión abarcadora de protección a la víctima, la Ley Núm. 54 establece una definición amplia del término "relación de pareja" y reconoce que existen distintas relaciones en las que una persona puede sufrir de violencia doméstica.[35] En particular, la ley define "relación de pareja" de la siguiente forma: "[s]ignifica la relación entre cónyuges, ex cónyuges, las personas que cohabitan o han cohabitado, las que

---

[35] Véase, <u>El Informe Sobre Discrimen por Razón de Género en los Tribunales</u>, Comisión Judicial Especial para Investigar el Discrimen por Género en los Tribunales de Puerto Rico, Pág. 332 (1995).

sostienen o han sostenido una <u>relación consensual íntima</u> y los que han procreado entre sí un hijo o una hija."[36]

Ciertamente, todas éstas son "relaciones de pareja" sin que exista indicio alguno de que el legislador haya conceptualizado el término como uno que únicamente abarca "relaciones entre un hombre y una mujer". Por el contrario, son relaciones de pareja tanto las relaciones entre cónyuges como las relaciones entre "personas que [...] sostienen o han sostenido una relación consensual íntima", sin que dicho término se haya conceptualizado para incluir sólo ciertas relaciones consensuales íntimas. A igual conclusión llega la *Comisión Judicial Especial para Investigar el Discrimen por Género en los Tribunales de Puerto Rico* en su abarcador informe al disponer que, <u>de conformidad con la ley, el término "pareja" incluye diversos tipos de relaciones de pareja dentro del cual se deben incluir las parejas del mismo sexo, ya que el propósito de la ley es proteger a **toda víctima** de violencia doméstica.</u>[37]

Como se puede apreciar, la Ley Núm. 54 fue consagrada principalmente para *detener* la violencia que se da en el contexto de una relación íntima de pareja y a la vez *proteger* a las víctimas de este mal social. Dicha legislación también procura *prevenir* la violencia doméstica y rehabilitar a los agresores que incurren en tal conducta. Véase, Esther Vicente Rivera, <u>Beyond Law Reform: The Puerto Rican Experience with Legal Remedies for Intimate Violence,</u> Pág. 215. Con esto en

---

[36] 8 L.P.R.A. sec. 602
[37] Véase, <u>El Informe Sobre Discrimen por Razón de Género en los Tribunales,</u> *supra en la nota 16*, Págs. 333, 400

mente, examinemos en detalle los Artículos 3.1 y 3.2 sobre maltrato y maltrato agravado.

D

El Art. 3.1 de la Ley Núm. 54, 8 L.P.R.A. sec. 631, tipifica el delito de "maltrato" y establece:

Toda persona que empleare fuerza física o violencia psicológica, intimidación o persecución en la persona de su cónyuge, ex cónyuge, o la persona con quien cohabita o haya cohabitado, o la persona con quien sostuviere o haya sostenido una relación consensual, o la persona con quien haya procreado un hijo o hija, para causarle daño físico a su persona, a los bienes apreciados por ésta, excepto aquellos que pertenecen privativamente al ofensor, o a la persona de otro o para causarle grave daño emocional, será sancionada con pena de reclusión[.] (Énfasis suplido).

De otra parte, el Art. 3.2, 8 L.P.R.A. sec. 631, sobre "maltrato agravado", dispone:

Se impondrá pena de reclusión [...] cuando en la persona del cónyuge, ex cónyuge o de la persona con quien se cohabita o se haya cohabitado, o con quien se sostiene o haya sostenido una relación consensual, o con quien se haya procreado un hijo o hija, si se incurriere en maltrato según tipificado en este capítulo, mediante una o más de las circunstancias siguientes: [...]

(e) cuando se cometiere luego de mediar una orden de protección o resolución contra la persona acusada expedida en auxilio de la víctima del maltrato[.] (Énfasis suplido).

Como se puede apreciar, mediante dichos artículos se protege a: (i) cónyuges (ii) ex-cónyuges; (iii) con quien se cohabita o se haya cohabitado; (iii) con quien se sostiene o haya sostenido una relación consensual o; (iv) con quien se haya procreado un hijo o hija. Nos corresponde pues analizar estas categorías para determinar si una persona víctima de violencia doméstica en el contexto de una "relación consensual homosexual" está protegida por la aludida disposición. Veamos.

Debemos comenzar enfatizando que, evidentemente, cada categoría ha de tener una definición propia, un campo de acción independiente y distinto de la anterior. De lo contrario, si un término estuviese incluido en el otro, no habría necesidad alguna para enumerarlos como conceptos separados.

Los conceptos "cónyuge", "ex-cónyuge" y "persona con quien se haya procreado un hijo o hija" no ofrecen mayores problemas en este caso. Son conceptos que aluden, bien a la institución matrimonial o a una instancia de paternidad y que no están involucrados en la controversia ante nos.

Por su parte, el concepto "cohabitar" es definido en la propia ley de la siguiente forma: "[s]ignifica sostener una relación consensual similar a la de los cónyuges".[38] Tal definición es particularmente reveladora para dilucidar la controversia que nos ocupa. Como se puede apreciar, dicho término se refiere a una clase limitada de "relaciones consensuales": aquellas similares a la de los cónyuges. Evidentemente esto supone que existen otras relaciones consensuales que no son similares a las de los cónyuges.

Esto nos lleva al término objeto de estudio, "relación consensual". De la propia ley se deduce que dicho término no está limitado a una relación similar a la de los cónyuges pues tal relación ya está constituida en el concepto "cohabitar". Se trata, pues, de un concepto más amplio que "cohabitar" y que el legislador no quiso sujetar al requisito de similaridad con una relación conyugal. Basta sostener una "relación consensual" con la víctima e incurrir en uno de los comportamientos tipificados

---

[38] Art. 1.3 de la Ley Núm. 54, 8 L.P.R.A. sec. 602.

para entrar en el marco de aplicación del artículo. La utilización del término "relación consensual" como uno distinto a "cónyuge", "ex-cónyuge", "cohabitar" o "procrear un hijo" significa que la intención del legislador fue ampliar el alcance de la ley a un grupo de personas que no están identificados por ninguna de las categorías anteriores.

Un análisis cuidadoso del historial legislativo revela que dicho término no estaba incluido en los proyectos de ley que precedieron a la versión que finalmente prevaleció, sino que fue añadido en un claro intento por extender el ámbito de aplicación de la ley. Como cuestión de hecho, los proyectos que inicialmente se presentaron ante el Senado y la Cámara, como por ejemplo, el P. del S. 90 de 2 de febrero de 1989 que proponía enmendar el Código Penal para añadir el delito de "maltrato conyugal", y los P. del S. 470 y P. de la C. 615 de 28 de abril de 1989, sobre violencia doméstica, no incluían es sus respectivas disposiciones el término "relación consensual".[39] La Asamblea Legislativa, consciente de que los proyectos presentados dejaban desprovistos a un gran número de personas que se encuentran en relaciones de parejas que igualmente se ven amenazadas por incidentes de maltrato y violencia, optó por redactar un estatuto con categorías más amplias para de ese modo hacer efectivo el espíritu de la ley. El concepto "relación consensual" fue adicionado precisamente, para incluir otros tipos de relaciones previamente no incluidas que incluso podrían

---

[39] Este último, por ejemplo, disponía que cometía maltrato "Toda persona que empleare fuerza física, violencia física o psicológica, intimidación, o persecución en la persona de su cónyuge, ex-cónyuge, o de cualquier persona con quien cohabite o haya cohabitado, o de cualquier persona con quien haya procreado un hijo o hija[.]".

no ser similares a la de los cónyuges. Así, el término "pareja consensual" tiene que, necesariamente, ser más amplio que las otras categorías dispuestas, sin que el legislador haya delimitado el tipo de "relación consensual" de la que se deba tratar.

A pesar de que las actuaciones de la Asamblea Legislativa claramente denotan la intención de crear un estatuto abarcador para proteger a todas las personas que se encuentran en relaciones abusivas y/o violentas, la mayoría de este Tribunal propone que dicho término se añadió para cobijar única y exclusivamente a parejas compuestas por un hombre y una mujer que llevan una relación afectiva-consensual, y que no necesariamente cohabitan. Es decir, donde la ley dice "pareja consensual" la mayoría entiende "pareja consensual heterosexual que no viven juntos", por lo que no se puede aplicar dicha disposición al acusado de autos. Dicho análisis no sólo ignora el historial legislativo previamente esbozado, sino que no se sostiene aún con la más liberal de las interpretaciones lingüísticas.

La mayoría sostiene además que "esta interpretación es consistente con la política pública a favor de la familia, ya que estas relaciones muchas veces tienen hijos en común, además que en algunas ocasiones suponen un eventual matrimonio". Sin embargo, este fundamento tampoco se sostiene toda vez que las relaciones mencionadas, como por ejemplo, las que tienen hijos en común, ya están protegidas por otras categorías de la legislación en cuestión.

De este modo el hecho de que la Asamblea Legislativa haya añadido dicho término no puede ser interpretado de otro modo que no sea que la intención de la legislatura fue crear un estatuto abarcador para proteger a todas las personas que se encuentran en relaciones abusivas y/o violentas, sin que se haya dispuesto límite alguno al tipo de relación a la que se refiere.

Por ello, en vista que el legislador no fijó limitación alguna al término "relación consensual" y estructuró la Ley Núm. 54 de manera neutral, sin consideración al género de las personas, este Tribunal está impedido de dejar desprovista de protección a una presunta víctima de violencia doméstica si, en efecto, dicha persona participaba de una "relación consensual" aunque sea una relación consensual entre personas del mismo sexo.

Mediante la Ley Núm. 54 el legislador quiso atender los problemas particulares que enfrenta una persona víctima de violencia doméstica en una "relación consensual" bajo la premisa de que la violencia que ocurre en los espacios de intimidad merece mayor atención social y de la protección especial de la Ley Núm. 54. Evidentemente, no resulta irrazonable que el legislador haya decidido proteger a toda víctima de violencia doméstica en una "relación consensual", con independencia del género de los que componen la relación, bajo el entendimiento de que los incidentes de violencia doméstica en una "relación consensual" (sea heterosexual u homosexual) presentan todas las particularidades y problemáticas que la Ley Núm. 54 quiso atender.

CC-2002-35                                                                20

Al así legislar, se reconoció que el problema de la violencia doméstica entre parejas del mismo sexo es tan serio como en parejas heterosexuales.[40] La dinámica de violencia en las relaciones íntimas entre parejas del mismo sexo se asemeja a los patrones de abuso en las relaciones heterosexuales.[41] De hecho, se ha comentado que la incidencia de violencia, severidad y la tendencia a escalar con el tiempo son similares en ambos tipos de relación.[42] La violencia doméstica, que se presenta como la suma de actos pasados de intimidación y coerción, y la promesa de violencia futura[43], puede estar tan presente en una relación heterosexual como en una homosexual. Así pues, declarar someramente, como hace la Opinión mayoritaria, que la Ley Núm. 54 no protege a parejas del mismo sexo debido a que "en relaciones entre personas de un mismo sexo no cabe hablar de disparidad entre los sexos", denota una falta de sensibilidad sobre los problemas que pueden tener las parejas en este tipo de relación. Por otro lado, si ese fuera el criterio para aplicar las disposiciones de la Ley Núm. 54, dejaríamos desprovistos a los hombres, que a manos de sus esposas o compañeras, también son víctimas de esta mal social.

[40] Véase, Krisana M. Hodges, Trouble in Paradise: Barriers to Addressing Domestic Violence in Lesbian Relationships, 9 Law & Sexuality 311, 312 (1999-2000); Nancy J. Knauer, *supra* a la Pág. 329; Nancy E. Murphy, Queer Justice: Equal Protection for Victims of Same-Sex Domestic Violence, 30 Val. U. L. Rev. 335, 340 (1995); Note, Victims of Abuse and Discrimination: Protecting Battered Homosexuals Under Domestic Violence Legislation, 28 Hofstra L. Rev. 1095, 1105 (2000).
Para estudios en nuestra jurisdicción véase, Toro-Alfonso & Rodríguez-Madera, Violencia Doméstica en Parejas de Hombres Gay Puertorriqueños: Prevalencia, Violencia Intergeneracional, Conductas Adictivas y Destrezas de Manejo de Conflictos; Toro-Alfonso (1999), Domestic Violence Among Same Sex Partners in Puerto Rico: Implications for HIV Intervention, Journal of Gay & Lesbian Social Services, 9, 69-79.
[41] Klein & Orloff, *supra* a las Págs. 834-835.
[42] *Id.* a la Pág. 835.
[43] Carla Da Luz, *supra* a las Págs. 255-256.

La Asamblea Legislativa demostró un entendimiento cabal sobre la naturaleza particular de la violencia doméstica cuando aprobó la Ley Núm. 54. y estimó que una agresión contra una pareja, independientemente de la naturaleza de la misma, ameritaba de una protección especial. Así, determinó que era necesario atender desde una óptica institucional una realidad de la convivencia social moderna; descartando la antigua noción de que la violencia en las parejas era un asunto de la "esfera privada" inmune de protección estatal.

Al legislador reconocer la violencia doméstica como un problema social con particularidades específicas se comprende que haya querido prohibir todo tipo de violencia doméstica en una relación de pareja. De hecho, esta visión abarcadora fue defendida repetidamente en el proceso de configuración de la Ley Núm. 54 bajo la premisa de que sería insuficiente prohibir sólo la violencia entre cónyuges y dejar desprovistos de protección a un sin número de grupos que se encuentran en relaciones de intimidad con problemáticas similares. Véase, Esther Vicente, *supra* a la pág. 581, ("Extending [Act 54's] arm to cover persons who are in relationships outside legal marriage was an important step in the process of recognizing that in Puerto Rico familiar and sexual-affective relationships are formed in multiple structures and not limited to the traditional family unit.").

El legislador quiso reconocer una realidad social de la convivencia moderna, en la que existen distintos tipos de "relaciones consensuales" en las que pueden surgir conflictos e incidentes de violencia que acarrean todos los peligros y consideraciones que la Ley Núm. 54 pretendió atender. No hay

duda de que bajo esta visión legislativa, toda víctima de violencia doméstica en una relación consensual está bajo la tutela de la Ley Núm. 54. El legislador entendió que no existía razón para cualificar el tipo de relación consensual que debía protegerse y no vemos razón alguna para descartar el juicio legislativo. La Asamblea Legislativa no está obligada a plasmar en dicha ley todas las situaciones imaginables en que se puede cometer el delito de maltrato o maltrato agravado dentro de una relación consensual íntima bajo la Ley Núm. 54. Además sería absurdo pensar que el legislador quiso proteger a las víctimas de violencia únicamente cuando el sexo de la persona que propina los golpes es distinto al de la víctima. Dicha interpretación ahogaría el propósito de esta legislación de vanguardia.

**Así pues, a diferencia de una mayoría de este Tribunal, consideramos que tanto la letra de la ley como el historial legislativo de la misma, denotan un lenguaje claro y abarcador en el cual se protegen, entre otros tipos de relaciones, las relaciones entre personas del mismo sexo por ser éstas relaciones consensuales íntimas. No nos corresponde pasar juicio sobre la determinación legislativa de proteger a toda persona que haya sostenido una "relación consensual" de incidentes de violencia doméstica. Lejos de ser irrazonable, la misma es cónsona con el propósito de la Ley Núm. 54 y está fundamentada en la realidad social que se pretendió atender.** A la luz de toda esta normativa, pasemos a discutir la situación particular que tenemos ante nos.

III

Como hemos visto, la disposición imputada (artículo 3.2, sobre maltrato agravado) tipifica como delito el maltrato cometido contra una persona "con quien se sostiene o haya sostenido una relación consensual" cuando se cometiere "luego de mediar una orden de protección". Según anticipamos, en esta etapa procesal, el acusado no cuestiona la suficiencia de la prueba desfilada durante la vista preliminar a los efectos de que sostenía una "relación consensual" (que no es otra cosa que una relación sentimental mutua y voluntaria) con la presunta víctima, y que empleó violencia física en violación a una orden de protección. Es pues meridianamente claro que la conducta del imputado comprende todos los elementos constitutivos del delito tipificado. Acoger el planteamiento del señor Ruiz Martínez, a los efectos que el delito no se configuró debido a que la conducta punida se perpetró contra una persona con quien éste sostenía una relación consensual "homosexual", mancilla la dignidad de este Tribunal y de los individuos que acuden ante nos en busca de justicia.

Contrario a lo dispuesto por la mayoría de este foro, no existe indicio alguno de que el legislador haya pretendido excluir a parejas homosexuales del ámbito de aplicación de la Ley Núm. 54. Por el contrario, dicha legislación ha pretendido atender el problema de la violencia que surge en los espacios de intimidad a la luz de una nueva óptica y sin hacer abstracción de la realidad social vigente en la que coexisten distintos tipos de "relaciones de parejas" que sufren de violencia doméstica. El sistema legal aborrece la violencia doméstica en una relación consensual, sea heterosexual u homosexual.

Por último, a diferencia de lo expresado en la Opinión mayoritaria, resulta totalmente insuficiente remitir a una persona víctima de violencia doméstica, en el contexto de una relación homosexual, a la tutela del sistema penal tradicional; sobre todo cuando el legislador no ha optado por excluir a tal persona de la cobertura particular de la Ley Núm. 54.[44] Como bien advierte el Procurador General en su alegato ante nos, recurrir a disposiciones análogas del Código Penal para atender los incidentes de violencia doméstica que surgen en una relación de pareja homosexual sería inadecuado ya que conllevaría descartar todo el abarcador enfoque, tanto punitivo como rehabilitador, que incorpora la Ley Núm. 54 a nuestro ordenamiento, e ignorar las realidades particulares que presenta la violencia en los espacios de intimidad. Ya antes habíamos advertido que "[a]legar que la persona víctima de violencia doméstica puede recurrir a las disposiciones análogas del Código Penal para denunciar a su cónyuge o compañero agresor es ir en contra de las razones mismas por las cuales se creó la Ley 54." Pueblo v. Figueroa Santana, *supra*.

**En fin, concluimos que la Ley Núm. 54 tiene aplicación cuando el incidente de violencia doméstica surge en el contexto de una relación consensual homosexual. Una correcta interpretación y aplicación de nuestro ordenamiento jurídico no puede llevarnos a otra conclusión; resolver lo contrario sería establecer una distinción que, además de carecer de fundamento racional alguno, contravendría el claro texto de la Ley Núm. 54.**

---

[44] Contrario a lo que sugiere la Opinión mayoritaria, la Ley Núm. 284 de 21 de agosto de 1999, conocida como la 'Ley de Acecho', no es aplicable a la controversia de autos.

**"El patente tenor literal"[45] de dicha ley, que protege a <u>toda</u> víctima de violencia doméstica, no permite una interpretación que limite su protección sólo a parejas heterosexuales. Cuando una ley en la que se tipifica un delito penal es clara, los tribunales no tienen la facultad de añadirle limitaciones o restricciones que no aparecen en su texto, con el pretexto de interpretarla.** <u>Pueblo v. Figueroa Santana</u>, *supra*.

A pesar de que las disposiciones aludidas claramente aplican a la controversia de autos, la mayoría de este Tribunal se ampara en una interpretación limitada del principio de legalidad para negarle a parejas consensuales del mismo sexo los remedios que en derecho les cobijan. La Opinión de este Tribunal no sólo extrapola el significado jurídico de dicho principio para amoldarlo a la situación de marras, sino que además incide al aplicarlo, en la forma en que lo hace, a la situación ante nos. Veamos.

IV

El Principio de Legalidad está consagrado en el Art. 8 del Código Penal de Puerto Rico, 33 L.P.R.A. § 3031, el cual dispone:

> No se instará acción penal contra persona alguna por un hecho que no esté expresamente definido por la ley como delito, ni se impondrán penas o medidas de seguridad que la ley no hubiere previamente establecido.
>
> Tampoco se podrán crear por analogía delitos, penas, ni medidas de seguridad.

---

[45] Véase, Opinión de Conformidad del Juez Asociado señor Fuster Berlingeri en <u>Afanador Irrizary</u>, *supra*.

En múltiples ocasiones se ha establecido que el primer párrafo de este artículo incluye las siguientes garantías, a saber; la garantía criminal de que no se acusará a persona alguna por un hecho que no esté previamente definido como delito; la garantía penal, que prohíbe la imposición de penas o medidas de seguridad que no se hayan establecido previamente por ley; y la prohibición de los estatutos vagos.[46] Por su parte, el segundo párrafo del artículo 8 del Código Penal prohíbe crear delitos, penas y medidas de seguridad por interpretación analógica. Las garantías antes mencionadas tienen el propósito de advertirle a los ciudadanos, de antemano, sobre las conductas constitutivas de delitos según tipificadas por el Estado, y protegen al individuo de actuaciones arbitrarias por parte de los jueces. Ciertamente, dicho fin se salvaguarda con la legislación en cuestión.

El delito imputado en el caso de autos dispone que incurrirá en el delito de "maltrato", según tipificado en el Art. 3.1 de la Ley Núm. 54, toda persona que estando en una relación consensual, empleare fuerza física contra su pareja.[47] Así, toda persona que sostenga una relación sentimental mutua y voluntaria y que agreda o maltrate a la persona con quien sostiene esa relación, incurre en el delito antes mencionado. Como puede observarse, la Ley Núm. 54 claramente establece los hechos por los cuales se instará una acción penal, y le provee a

---

[46] Dora Nevares Muñiz, Código Penal de Puerto Rico, Comentado y Revisado, 1998-1999. Quinta Ed., Instituto para el Desarrollo del Derecho, Inc.
[47] Cabe aclarar que esta es sólo una de las categorías contempladas en dicho artículo.

una persona prudente y razonable una advertencia adecuada sobre la conducta prohibida. Es decir, no se necesita "un esfuerzo hermenéutico propio de juristas", según señala la Opinión Per Curiam, para comprender la conducta proscrita por el estatuto en cuestión.

Ciertamente entre los distintos corolarios del Principio de Legalidad se encuentra además la norma que establece que los estatutos penales deben interpretarse restrictivamente en cuanto a lo que desfavorezca al acusado, y liberalmente en cuanto a lo que le favorezca. No obstante, esta norma de hermenéutica <u>sólo aplica en situaciones donde no es posible descifrar la intención legislativa</u> y existan dudas genuinas sobre el alcance o sentido de la disposición penal, <u>Pueblo v. Sierra Rodríguez</u>, 137 D.P.R. 903 (1995); <u>Pueblo v Tribunal Superior</u> 101 D.P.R. 439 (1973). Dicho precepto, a diferencia de lo que se desprende de la Opinión mayoritaria, no es de aplicación automática en cada controversia que requiera la interpretación de un estatuto penal. Además, contrario a lo que se requiere para aplicar dicho corolario, del historial legislativo del estatuto en cuestión claramente se desprende que la intención de la Asamblea Legislativa fue redactar una legislación abarcadora con un lenguaje neutral para proteger a todas las víctimas de violencia doméstica, y a la misma vez establecer medidas punitivas para las personas que maltratan física y psicológicamente a sus parejas.[48]

---

[48] Como bien señala la Opinión Per Curiam, al lenguaje de una ley debe dársele la interpretación que valide el propósito del legislador. Es precisamente por ello que sostenemos que al señor Ruiz Martínez le son aplicables las disposiciones de la Ley Núm. 54.

La norma de interpretación restrictiva **tampoco exige que al texto de una ley deba dársele un significado más limitado que el que usualmente tienen dentro de la realidad social o que deba hacerse caso omiso a la evidente intención del legislador**. Pacheco v. Vargas 120 D.P.R. 404 (1988). La máxima (de interpretación restrictiva) no puede ser aplicada de manera que limite las palabras de un estatuto hasta excluir casos que están comprendidos dentro de la acepción ordinaria del texto de dicha ley.[49] Dicha norma procura evitar una aplicación de una ley penal que sea inconsistente con el propósito legislativo de la misma. Así pues, incide la mayoría de este Tribunal al presumir, sin más, que el derecho penal exige que todos los estatutos penales se interpreten restrictivamente, y al estimar que ello constituye una razón válida para no aplicarle al imputado de autos las disposiciones de la Ley Núm. 54.

Por último, incide la mayoría de este Tribunal al concluir que: "no estando la relación de parejas del mismo sexo entre aquellas que la referida ley **expresamente** dispone para su aplicación,...el principio de legalidad nos impide que procesemos al acusado bajo el palio de la misma". (*Énfasis suplido*). En otras palabras, la Opinión Per Curiam estima que debido a que La Ley Núm. 54 no dispone expresamente que el delito incluye a parejas consensuales del mismo sexo, el estatuto no es aplicable a la situación de autos.

---

[49] De hecho, el Art. 6 del Código Penal de Puerto Rico, 33 L.P.R.A §3021, señala que "las palabras y frases se interpretarán según el contexto y el significado sancionado por el uso común y corriente".

CC-2002-35                                                                     29

A tales efectos, cabe mencionar que el estatuto aludido tampoco dispone expresamente que el término "persona con quien sostuviere o haya sostenido una relación consensual" se refiere a parejas consensuales compuestas por un hombre y una mujer, por lo que, siguiendo dicho argumento, tampoco podríamos aplicarle la referida disposición a las parejas heterosexuales.

Asimismo, el argumento de la mayoría nos llevaría a la conclusión ilógica de que al acusado de marras tampoco lo podríamos encausar por el delito tradicional de agresión, ya que dicho articulado no dispone expresamente que el delito aplica a personas homosexuales. Es decir, bajo la tesis de la mayoría, aún cuando el Art. 95 del Código Penal decreta (de manera similar a los Arts. 3.1 y 3.1 de la Ley Núm. 54) que "toda persona que empleare fuerza o violencia contra otra para causarle daño..." incurre en el delito de agresión, dicho delito no es aplicable al acusado de autos debido a que el mismo no establece expresamente que la conducta punida comprende a personas homosexuales. Dicho argumento no tiene cabida en nuestro sistema de derecho.[50]

Como señalamos anteriormente, la Asamblea Legislativa no está obligada a plasmar en una ley todas las situaciones imaginables en que se puede cometer el delito. Basta que la conducta del imputado esté claramente establecida dentro del texto de la legislación y que una persona promedio esté razonablemente advertida que la misma es constitutiva de delito,

---

[50] De hecho, bajo esa teoría las personas homosexuales estarían exentas de la mayoría de los delitos tipificados en el Código Penal de Puerto Rico.

para que el Estado pueda encausarla por dicha conducta.[51] Estimamos que en el caso de autos se cumple a cabalidad con el principio de legalidad y los corolarios que del mismo se desprenden.

Así pues, y con el mayor respeto a la mayoría de este Tribunal, debemos señalar que la Opinión Per Curiam no se puede sostener a base del principio de legalidad. Su resultado es contrario a la letra y el espíritu de la Ley Núm. 54 y tiene el efecto de discriminar contra un sector de nuestra sociedad.

V

En resumen, la Ley Núm. 54 fue promulgada como respuesta gubernamental a los incidentes de maltrato y violencia que se dan en los espacios de intimidad debido a las particularidades que este tipo de violencia acarrea. Conscientes de que el problema de la violencia doméstica no se circunscribe a ciertos tipos de relaciones, nuestra Asamblea Legislativa redactó dicho estatuto con una <u>terminología amplia</u> y con un <u>lenguaje neutral</u> para cobijar a **todas** las víctimas de este mal social.

**Sostener, como lo hace una mayoría de este Tribunal, que el propósito de la Ley Núm. 54 es fortalecer la institución de la familia, y usar dicho argumento para negarle a ciertas víctimas de violencia doméstica la protección que se le confiere con esta ley, no sólo delimita el propósito abarcador de la legislación, sino que le falta a los principios más básicos de justicia y**

---

[51] Naturalmente, la disposición tendría que cumplir con los otros corolarios del principio de legalidad como, por ejemplo, la garantía de que la pena haya sido previamente establecida, y que el estatuto no sea aplicado retroactivamente. Estas garantías no están en controversia en la situación de marras por lo que declinamos discutirlas con más detenimiento.

**ecuanimidad. Máxime cuando las disposiciones de la Ley Núm. 54 le aplican a relaciones que claramente no son compatibles con la institución de la familia como lo serían las relaciones adulterinas. De hecho, dicha legislación protege relaciones de concubinos, ex cónyuges y novios, relaciones que claramente no caen bajo el palio de la "familia tradicional".**

**Reconocemos la importancia de la institución de la familia en nuestra sociedad. No obstante, esto no debe ser fundamento para abdicar la responsabilidad y la obligación que se nos ha conferido por ley para intervenir y proteger a <u>todas</u> las víctimas de violencia doméstica, aún aquellas cuya relación no cae dentro del contexto "tradicional" de lo que constituye una pareja o una familia.**

Así pues, debido a que a juicio nuestro las disposiciones de la Ley Núm. 54 son aplicables a los incidentes de maltrato y violencia que se dan dentro de cualquier tipo de relación consensual, incluyendo aquellas entre personas del mismo sexo, confirmaríamos el dictamen del tribunal apelativo que revocó la decisión del foro de instancia. Una interpretación objetiva de los estatutos en cuestión **<u>no</u>** puede llevarnos a otra conclusión. El tiempo nos dará la razón. Llegará el día en que este Tribunal le garantice a las minorías sexuales los mismos derechos que protegen al resto de la sociedad y rectifique la injusticia y el discrimen causados por esta decisión. En vista de todo lo antes dispuesto, disentimos.

> Federico Hernández Denton
> Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Recurrido

        vs.                 CC-2002-35    Certiorari

Leandro Ruiz Martínez

    Peticionario

Opinión Disidente emitida por el Juez Asociado SEÑOR FUSTER BERLINGERI

San Juan, Puerto Rico, a 8 de abril de 2003.

Con el propósito de ubicar en su propia perspectiva la controversia del caso de autos, para comenzar conviene resaltar sus hechos medulares.

Al acusado se le imputa haber agredido con los puños a otra persona con quien sostenía una relación homosexual. La conducta del acusado alegadamente **<u>fue también en violación de una orden de protección</u>** que un tribunal de instancia había emitido poco antes debido a que el acusado ya había agredido a su compañero en tres ocasiones previas.

Contra el acusado se presentó una denuncia al amparo de la llamada Ley de Violencia Doméstica (la Ley) por el delito de **<u>maltrato agravado</u>**. Ese delito se configura, *inter alia*, cuando la conducta criminal

de marras se comete **luego de mediar una orden de protección**, como alegadamente sucedió en el caso de autos. Por ello, el acusado estaba expuesto a una pena de reclusión de **dos a cinco años**, 8 L.P.R.A. sec. 632, en lugar de la pena ordinaria de nueve a dieciocho meses de reclusión que apareja el delito de maltrato conforme a la Ley referida, 8 L.P.R.A. sec. 631. Más importante aun, por ello también el acusado **no cualificaba para el remedio de desvío y libertad a prueba** que dispone la Ley para algunos casos de maltrato doméstico. 8 L.P.R.A. sec. 636 (b).

Al momento en que el acusado agredió a su compañero ya era de conocimiento público que las agresiones contra parejas del mismo sexo se penalizarían al amparo de la Ley de Violencia Doméstica. Más aun, **la orden de protección contra el acusado se había procurado precisamente al amparo de dicha Ley, sin que dicho acusado hubiese cuestionado su aplicabilidad entonces**. Sin embargo, varias semanas después de ser denunciado por el delito de maltrato agravado al amparo de la Ley referida, el acusado impugnó que dicha Ley fuese aplicable a los homosexuales. Parece evidente que el planteamiento referido fue motivado por el hecho de que el acusado estaba impedido de acogerse al beneficio de desvío y libertad a prueba que provee la Ley, mencionado antes. Sea ello así o no, el caso de autos le presenta a este Tribunal la controversia de si la referida Ley de Violencia Doméstica aplica a las parejas homosexuales –a la de este caso y a **otras que puedan no presentar las circunstancias particulares de la pareja en cuestión**. Veamos.

II

Desde el punto de vista técnico-jurídico, la controversia ante nos se suscita por razón de la incongruencia que existe entre datos

centrales relativos a la Ley, que parecen ser incuestionables.

Por un lado, la mal llamada Ley de Violencia Doméstica tuvo como propósito primordial atender el grave problema social de la **violencia contra la mujer por parte de su compañero**. El mencionado título común de la legislación en cuestión no es enteramente preciso y genera confusión. Ello es así porque en sus orígenes dicha legislación no se estableció con el fin de prohibir sólo la violencia entre cónyuges, o para la protección de la familia como tal. El móvil primigenio, más bien, fue combatir la violencia contra la mujer en cualquier caso en que dicha violencia proviniese de algún hombre con quien la perjudicada tenía una relación estrecha, como sería por ejemplo el caso muy típico en Puerto Rico de la mujer agredida por su **concubino**.

La cuestión del nombre **inadecuado** de la Ley que aquí nos concierne merece ser enfatizado porque es la fuente de mucha de la perplejidad y turbación que genera la controversia del caso de autos. **Si la Ley referida tratase sobre el asunto indicado por su nombre, ésta dispondría sobre la violencia en el seno del hogar; es decir sobre la violencia entre los miembros de una familia, que es el significado común y corriente del concepto "violencia doméstica".** Pero resulta que la Ley **NO** trata de ningún modo medular sobre la violencia en el seno del hogar. Más bien, la Ley trata sobre la violencia **entre parejas; y no se limita a las parejas casadas**. No hay nada en la Ley que disponga que ésta sólo cubre la violencia **conyugal** o que se extiende únicamente a **matrimonios**. Por el contrario, la Ley hace referencia una y otra vez a la violencia entre **toda una variedad de parejas**; abarca inequívocamente toda una serie de relaciones más allá de las meramente **maritales**. No cabe duda alguna de que la Ley **no enfoca la violencia "doméstica" como tal**.

En efecto, el entramado y el contenido de la Ley en cuestión consisten medularmente de medidas y remedios para procurar la integridad física y emocional y la seguridad de las mujeres que están en riesgo de ser víctimas de conducta violenta por razón de sus relaciones íntimas con hombres, cualquiera que fueran tales relaciones, sin estar limitadas de modo alguno sólo a las matrimoniales.

Al aprobar la Ley en cuestión, el legislador estimó que en los casos en que un hombre abusaba de una mujer con quien tenía una relación íntima, fuese conyugal o de otra índole consensual, no bastaba que se le castigara mediante las medidas penales ordinarias relativas a la agresión. Tales hombres debían ser objeto de medidas punitivas **más severas** y las mujeres, además, debían tener a su disposición otros remedios, como las órdenes de protección, para atender la situación de **manera integral**. También se procuró establecer un mecanismo de desvío a fin de salvaguardar la relación íntima en aquellas situaciones en que ello era lo más deseable.

Establecidos, pues, los claros motivos primordiales del legislador al establecer la legislación referida, relativos a proteger de modo integral **a la mujer que fuese víctima de violencia de parte de su compañero**, debe señalarse ahora su otra gran incongruencia. Resulta que aunque la Ley fue ocasionada por el problema de la violencia contra la mujer referido antes, dicha legislación contiene disposiciones fundamentales que **están redactadas en términos tan amplios y neutrales** que son aplicables a cualquier persona que sea víctima de una conducta violenta por razón de la relación íntima suya con otra persona, **sin que importen los géneros de uno u otro**. El motivo originario de la Ley fue la violencia contra

la mujer provocada por sus relaciones íntimas con hombres, pero el texto final de la Ley trata claramente con cualquier tipo de violencia provocada por las relaciones consensuales íntimas entre personas.

En otras palabras, la Ley referida no sólo carece de un nombre adecuado, sino que, además, adolece de una innegable incongruencia entre lo que claramente motivó al legislador a establecer dicha Ley originalmente y lo que claramente dispone su letra.

Al atender nuestra indelegable responsabilidad de resolver la incongruencia referida en casos como el de autos, estamos obligados a guiarnos por unos fundamentales y conocidos principios jurídicos que informan nuestro quehacer.

En primer lugar, le debemos respeto y deferencia al claro tenor literal de la legislación en cuestión, como expresión de la voluntad final del legislador. Nótese que dicha legislación, en lo pertinente aquí, **es clara en su texto**. El significado común y corriente de lo expresamente dispuesto en ella no crea ambigüedad alguna. Sencillamente, se prohíbe el maltrato entre sujetos que sostienen una relación consensual íntima. Cualquier persona común y corriente entiende lo que dicha prohibición significa. Por ende, conforme a lo que ordena el propio Código Penal, Art. 6, sobre la interpretación de palabras y frases, 33 L.P.R.A. sec. 3021, y conforme a lo que hemos resuelto antes sobre el particular, Pueblo v. Sierra Rodríguez, 137 D.P.R. 903 (1995), debemos atenernos a lo que surge claramente de la letra de la ley, y con ello **"concluye la interpretación"**. Id, pág. 907.

Debe destacarse que ya antes habíamos encarado una situación similar a la del caso de autos, en que el claro texto de una

disposición penal no correspondía cabalmente a los propósitos originales de la ley que la creó. En esa ocasión resolvimos que nos obligaba el sentido literal claro de la disposición en cuestión. Aplica al caso de autos lo que resolvimos en Pueblo v. Martínez Yanzanis, 142 D.P.R. 871, 878 (1997):

> **"Si bien es cierto... que la particular cláusula penal en cuestión no corresponde cabalmente a los meritorios propósitos originales de la Ley..., más cierto aun es que el texto de esa cláusula es claro y sencillo, y no permite interpretación alguna que no sea la de su sentido literal. De ninguna manera nos encontramos ante una disposición que requiera interpretación para superar una vaguedad, una laguna o una redacción obscura o ambigua. No se trata de una disposición concreta que no dé aviso adecuado de lo que prohíbe."**

Es menester señalar, además, que en la situación que aquí nos concierne **no aplica el principio de legalidad**. Dicho principio va dirigido a evitar que se extienda a alguna persona una disposición penal por hechos realizados por ella que no están expresamente prohibidos por tal disposición. Lo que repudia ese fundamental principio es que se pretenda penalizar una conducta por analogía o, como señalamos en Pueblo v. Matías Báez, 100 D.P.R. 859, 865 (1972), que se intente **"por implicación abarcar dentro de una disposición penal otros casos que no están comprendidos en ella"**. Pero nada de lo anterior sucede aquí. En el caso de autos, la conducta en cuestión está expresamente prohibida por la legislación que aquí nos concierne. Los actos imputados a Ruiz Martínez **constituyen claramente el empleo de fuerza física contra la persona con quien sostenía una relación consensual**, tal y como lo prohíbe expresamente el Art. 31 de dicha legislación, 8 L.P.R.A. sec. 631. En términos comunes y corrientes, lo que ocurre entre los que integran una pareja homosexual constituye una relación consensual íntima. No hay aquí,

pues, una situación que permita invocar el principio de legalidad. Lo que hay aquí es otro tipo de complicación, según se ha indicado ya; lo que encaramos es una incongruencia entre los propósitos originales de la legislación referida y su claro sentido literal. En tal caso, venimos obligados por lo dispuesto textualmente, según lo hemos resuelto antes.

III

Otra consideración sencilla pero fundamental también está en orden aquí. Tiene que ver con la **víctima** en casos como el de autos. La mayoría en su opinión parece ocuparse sólo del maltratante en la relación homosexual, olvidando que en casos de maltrato entre homosexuales también hay una persona maltratada, una víctima que proteger.

Según se señaló antes, la médula de la legislación que aquí nos concierne radica en **tipificar como un delito más serio que el de la mera agresión**, el maltrato que se comete contra una persona por otra con quien la víctima ha tenido una relación consensual. El legislador estimó que dicho tipo de maltrato constituía un acto más anti-jurídico que la mera agresión, porque además del daño físico a la víctima, existía también el daño moral resultante **del abuso de la relación íntima**. En este tipo de maltrato no sólo se injuria a la víctima en sí, sino que se explota también la relación especial existente entre la persona maltratada y el maltratante, quien se aprovechó de ella para atacar a la otra persona **que tenía puesta su confianza en tal relación**. Es por ello que el maltrato referido apareja de ordinario una pena mínima de nueve meses de reclusión

mientras que la agresión simple sólo acarrea en su pena mínima una multa de $500. Por ello, también el maltrato referido agravado de ordinario conlleva una pena de reclusión de tres años mientras que la agresión agravada de ordinario apareja una pena de reclusión de sólo seis meses. No cabe duda de que el maltrato referido como delito es un crimen más serio que la agresión, **por lo que se castiga con una pena más severa**.

La doble anti-juridicidad referida, que justifica la mayor severidad punitiva de la Ley en cuestión, existe indudablemente en casos de maltrato relativo a parejas homosexuales como existe en el relativo a los varios tipos de parejas heterosexuales. Es un dato innegable de la realidad que el homosexual que maltrata a la persona con quien tiene una relación consensual íntima no sólo incurre en un acto de violencia contra ésta, **sino que se ceba también de la relación especial entre ellos**. Se justifica, pues, que a las parejas homosexuales se les extienda también el esquema punitivo particular de la legislación referida, independientemente de los juicios sociales que puedan prevalecer sobre la moralidad de los actos sexuales en sí de tales parejas. La situación de los homosexuales no es distinta en tal sentido de las de parejas heterosexuales que sostienen relaciones carnales como concubinos, como compañeros adulterinos o a meramente como novios fornicadores, a quienes la Ley también ampara sin que a nadie sorprenda y sin que nadie lo cuestione. Existe, pues, un claro fundamento para sostener que a las parejas homosexuales les aplica la legislación aludida, que concuerda con el claro tenor literal de la Ley. En el caso de maltrato entre parejas homosexuales está involucrada una anti-juridicidad similar a la que existe con respecto al maltrato entre otras parejas

CC-2002-35                                                            9

heterosexuales que han sostenido relaciones consensuales. Dicho de manera más sencilla, la víctima del maltrato referido que es homosexual sufre daños jurídicos mayores que la víctima de una mera agresión, como sucede también con la víctima de maltrato que es heterosexual. Negarle a aquella la protección que el ordenamiento penal dispone en términos claramente aplicables a ambas víctimas no sólo contraviene lo que preceptúa la Ley textualmente, sino que es contrario también a la justificación jurídica de ésta.

Resulta, pues, que la lógica  interna de la Ley, como su claro sentido literal, apuntan ambos a su aplicabilidad a las parejas homosexuales. No le compete a este Tribunal hacer una interpretación que sea contraria al claro sentido y a la clara letra de la Ley. Lo que nos compete aquí es acatar lo dispuesto por el legislador.


IV

Con arreglo a lo expuesto antes, yo adjudicaría el caso de autos al amparo de lo que claramente dispone la llamada Ley de Violencia Doméstica. Como la mayoría del Tribunal resuelve de otro modo, yo disiento.


JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO